**In re BOULDERS ON THE RIVER, INC., Debtor.**

**UNITED STATES TRUSTEE, Appellant,**

**v.**

**BOULDERS ON THE RIVER, INC., Appellee.**

Civ. No. 97–6138–HO.
Bankruptcy No. 692–64208–AER11.

United States District Court,
D. Oregon.

Dec. 18, 1997.

---

**530**

Wilson C. Muhlheim, Muhlheim, Palmer & Wade, Eugene, OR, Charles M. Zennache, Walters, Romm, Chanti & Dickens, P.C., for Boulders on the River.

Paul J. Garrick, Eugene, OR, United States Trustee.

### ORDER

HOGAN, Chief Judge.

The United States Trustee ("UST") appeals from the January 31, 1997, order of the bankruptcy court requiring the debtor, Boulders on the River, Inc. ("Boulders"), to pay the minimum quarterly fee of $250 for the second quarter of 1996, pursuant to 28 U.S.C. § 1930(a)(6), as recently amended by Congress. The order further indicates a final decree closing the case, although otherwise appropriate, will be withheld pending payment of the proper fee. *In re Boulders on the River, Inc.,* 205 B.R. 948, 952 (Bankr.Or. 1997).

On appeal, the UST argues the bankruptcy court misinterpreted 28 U.S.C.A. § 1930(a)(6), the UST quarterly fee statute. The UST argues the bankruptcy court erred by calculating the fee based only on disbursements made by the bankruptcy estate, rather than distributions made in the case generally. In particular, the UST objects to the bankruptcy court's refusal to consider disbursements made by the reorganized debtor.

### BACKGROUND

The facts are not in dispute. The debtor, Boulders, an Arizona corporation, filed a petition for relief under chapter 11 of the United States Bankruptcy Code on July 21, 1992. Boulders' principal business is a 248–unit apartment complex located in Eugene, Oregon. The bankruptcy court valued the debtor's property at over $15 million, and for the purposes of voting and plan confirmation, the parties agreed the secured creditor was owed approximately $13.3 million. The bankruptcy court confirmed Boulders' plan of reorganization on April 14, 1993. The case remained open to resolve disagreements between the debtor and the secured creditor as well as other matters. *In re Boulders on the River, Inc.,* 169 B.R. 969 (Bankr.Or. 1994).

The plan of reorganization does not mention the payment of post-confirmation quarterly fees. Paragraph VIIA of the confirmed plan provides:

> On the Effective Date the Reorganized Debtor shall be vested with all of its property free and clear of all claims, liens, charges or other interests of creditors arising prior to the Confirmation Date except for liens upon property securing Allowed Secured Claims provided for in the Plan. The Reorganized Debtor may transact business and conduct its affairs free of any

restriction of the Court or the Code, except as explicitly set forth in the Plan and various security documents and debt instruments....

Second Amended Plan of Reorganization, p. 6.

Paragraph XI of the confirmed plan provides: "The Bankruptcy Court shall retain jurisdiction of this case for the following purposes: * * * D. To fix allowances of compensation and other Administrative claims." Second Amended Plan of Reorganization, XI, p. 8. The plan's glossary defines "Administrative Claim" to mean: "all costs and expenses of administration allowed under Bankruptcy Code § 503(b), including, without limitation ... any fees or charges assessed against the estate of a debtor under Chapter 123, Title 128, United States Code § 1930." Second Amended Plan of Reorganization, XIII, p. 10.

The plan also provides for the preservation of certain causes of action:

Any and all causes of action which the Debtor may currently possess (known or unknown), or which may subsequently arise under any of the provisions of the Code or which may be enforceable under any of the provisions of the Code, or any other law or statute, shall be preserved and this Court shall retain jurisdiction to dispose of such causes of action. All such causes of action shall belong to the Debtor as a part of the assets retained by the Debtor.

Second Amended Plan of Reorganization, XIIF, p. 10.

In November, 1995, two and a half years after the bankruptcy court confirmed the plan, Boulders and the secured creditor amicably resolved their differences, in large part through the refinancing of the property which resulted in an $11.5 million payment to the secured creditor. On June 11, 1996, Boulders filed its final report and application for entry of a final decree with the bankruptcy court. The UST filed a response arguing the decree should not be entered until Boulders paid the appropriate quarterly fee for the second quarter of 1996.[1]

On January 31, 1997, the bankruptcy court entered a memorandum opinion ordering Boulders to pay a quarterly fee of $250 for the second quarter of 1996, the minimum fee under the fee schedule set out in 28 U.S.C. § 1930(a)(6). The court concluded that, upon payment of the fee, a final decree would be entered closing the case. *Boulders*, 205 B.R. at 951. The court stated:

[T]he bankruptcy estate ceased to exist when the order of confirmation became final. Hence, there was no bankruptcy estate in existence during the second quarter of 1996. It follows, there were no 'disbursements' upon which to compute the fees owing to the UST pursuant to the statute.

* * *

It does not follow, however, that there are no fees owing to the UST pursuant to the statute. The statute makes it clear that fees are owing in "... each case under Chapter 11 of Title 11...." The statutory scale provides that the fees shall be "... $250 for each quarter in which disbursements total less than $15,000; ..." Here, since the disbursements for the second quarter of 1996 were less than $15,000, a fee of $250 is owed to the UST.

*Id.*

One substantive and two procedural issues are presented in this case. The substantive issue is whether the term disbursements in section 1930(a)(6) includes distributions made by a reorganized debtor. The procedural issues relate to the bankruptcy court's jurisdiction to hear and decide this matter and whether it properly withheld entry of a final decree pending payment of the fees.

For the reasons set forth below, this court will reverse the order of the bankruptcy court. The bankruptcy court's exercise of

---

1. The parties agree Boulders paid the proper fee for the first quarter of 1996. The UST is seeking fees only for the second quarter of 1996. The parties further agree that if disbursements from the reorganized debtor, rather than the bank-ruptcy estate, are the proper basis for calculation of the quarterly fee in this case, the correct fee for the second quarter of 1996 is $3,750. Appellant's Opening Brief at 2, n. 2; Brief of Appellee at 2, n. 1.

jurisdiction and the form of its order were proper.

## STANDARD OF REVIEW

A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*. *In re DAK Indus., Inc.,* 66 F.3d 1091, 1094 (9th Cir. 1995). Questions of statutory construction are conclusions of law subject to *de novo* review. *In re MacIntyre,* 74 F.3d 186, 187 (9th Cir.1996).

## STATUTORY AND LEGISLATIVE BACKGROUND

### a. Pre–Amendment Statute:

In 1996, Congress passed two amendments to the UST quarterly fee statute. Prior to these amendments, quarterly fees in chapter 11 cases terminated upon the occurrence of any of three events: (1) confirmation of a plan, (2) conversion of the case to another chapter of the bankruptcy code, or (3) dismissal of the case. Of these three, plan confirmation, which is ideally followed soon after by entry of a final decree closing the case, was and is the preferred and most frequently used method of concluding a chapter 11 case. Prior to one of these three terminating events, section 1930(a)(6) fees were determined for each quarter by reference to a graduated fee schedule set forth in the statute. Depending upon the level of disbursements in a quarter, section 1930(a)(6) fees ranged from a minimum of $250 for cases with disbursements less than $15,000, to a maximum of $5,000 for cases with disbursements of $3 million or more. The pre-amended statute is as follows:

Section 1930. Bankruptcy Fees.

(a) Notwithstanding section 1915 of this title, the parties commencing a case under title 11 shall pay to the clerk of the district court or the clerk of the bankruptcy court ... the following filing fees:

\*\*\*\*

(6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until a plan is confirmed or the case is converted or dismissed, whichever occurs first. The fee shall be $250 for each quarter in which disbursements total less than $15,000; $500 for each quarter in which disbursements total $15,000 or more but less than $150,000; $1,250 for each quarter in which disbursements total $150,000 or more but less than $300,000; $3,750 for each quarter in which disbursements total $300,000 or more but less than $3,000,000; $5,000 for each quarter in which disbursements total $3,000,000 or more. The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed.

28 U.S.C. § 1930(a)(6) (1995).

When a debtor files a case seeking protection under chapter 11 of the bankruptcy code, a "bankruptcy estate" is immediately created and becomes the repository of the debtor's property generally until a plan is confirmed by the bankruptcy court. 11 U.S.C. §§ 541, 1141(b). Thus, under the pre-amended statute, quarterly fees and the bankruptcy estate often terminated at the same moment. Because fees were owed only during the existence of the bankruptcy estate, it was reasonable for courts and the UST, in calculating quarterly fees, to look only at disbursements made by the bankruptcy estate, and ignore distributions made subsequent to plan confirmation by the reorganized debtor or the otherwise reconstituted estate.

Within this context, and prior to the congressional amendments at issue here, the Ninth Circuit interpreted "disbursements" broadly to encompass all payments from the bankruptcy estate. *St. Angelo v. Victoria Farms,* 38 F.3d 1525, 1534 (9th Cir.1994), *modified in part,* 46 F.3d 969 (9th Cir.1995) (no modification to analysis of "disbursements"). *See also In re Ozark Beverage Co., Inc.,* 105 B.R. 510 (Bankr.E.D.Mo.1989).

### b. January 1996 Amendment:

On January 26, 1996, President Clinton signed H.R. 2880, the Balanced Budget Downpayment Act, I, Pub.L. No. 104–99, 110

Stat. 26, 37–38 (1996). Section 211 of that legislation amended the UST fee statute, 28 U.S.C. § 1930(a)(6), by deleting the words "a plan is confirmed or." As amended, section 1930(a)(6) provides, in pertinent part, as follows (the language stricken is bracketed):

(6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until [**a plan is confirmed or**] the case is converted or dismissed, whichever occurs first.

28 U.S.C. § 1930(a)(6) (1996).

Thus, the January, 1996, amendment expanded the scope of the quarterly fees by removing one of the three terminating events.

### c. Legislative History of January Amendment:

The legislative history leading up to the enactment of the January amendment is helpful in uncovering its purpose, scope and intent. As with many federal budgetary matters and many initiatives proposed to Congress by the Executive, a full historical understanding of this provision is greatly assisted by reference to the budget justification documents submitted to Congress in conjunction with the President's annual budget proposal.

The UST system was originally established to operate as a self-funded program. H.R.Rep. 99–764, 99th Cong., 2d Sess., p. 26 (1986); *United States Trustee v. Endy* (*In re Endy*), 104 F.3d 1154, 1157 (9th Cir.1997). By the mid–1990s, quarterly fees, which constitute a significant portion of UST funds, had sharply declined.[2] In response to this decline in financial resources, as well as to a stated need for increased post-confirmation oversight, the budget justification documents filed in connection with the fiscal year 1996 budget proposed by the President for the UST program contained two proposals. One proposal, the amendment to the quarterly fee

statute at issue here, to pay for the other, a staffing increase.

The first proposal was to increase the UST staff by twenty attorneys in order to strengthen general chapter 11 case supervision and post-confirmation oversight. The second proposal was to amend the UST quarterly fee statute, 28 U.S.C. § 1930(a)(6), to require chapter 11 debtors to pay quarterly fees after plan confirmation. Both of these requests were ultimately granted. The budget justification document includes the following:

*Program Increase:* Increase by 55 positions (20 attorneys) ... to strengthen chapter 11 case supervision and post confirmation oversight.

\* \* \*

The most recent available data from the Administrative Office of the United States Courts indicates that as of September 30, 1994, there were 69,472 chapter 11 cases pending in the courts (including both pre-confirmation and post confirmation cases). Yet, the [UST] Program's chapter 11 data indicate that as of October 15, 1994 there were only 16,387 chapter 11 cases for which no confirmation plan had been approved. These statistics highlight the problem of chapter 11 cases languishing on the docket after a plan of confirmation had been approved by the court. For cases to remain on the docket in an active status when debtors are not meeting their obligations as specified in the restructuring plan is a patent abuse of the bankruptcy system. It is estimated that approximately 80 percent of the reorganization plans confirmed under chapter 11 of the Bankruptcy Code do not make it to fruition.

Monitoring debtors in post confirmation is a duty which was not envisioned by the staffing structure at the time of the Program's nationwide expansion and one for which the Program has never received resources. The requested increase is critical to ensure that there is an entity in the bankruptcy process which will require debtors to meet their post confirmation responsibilities under the law.

---

**2.** "U.S. Trustee Revenue Drop Causes Chapter 11 Quarterly Fee Increases and Imposition of Post–Confirmation Fees," 16–Feb. *Am.Bankr. Inst.J.* 26 (1997).

*General Provision:* The [requested increase in legal staff] is paid for by a proposed change in the law which, if enacted, would require chapter 11 debtors to continue to make quarterly payments based on disbursements until a case is converted or dismissed. The proposed change is a logical extension of the Program's present funding mechanism. Currently, chapter 11 debtors are only assessed quarterly fees until a reorganization plan is confirmed by the bankruptcy court, making post confirmation debtors the only entities in the bankruptcy process who are exempt from fees. There is no rational basis for such an exemption and the proposed amendment will close a loophole that allows cases to languish without paying for Program services.

Fiscal Year 1996 Budget Justifications, United States Trustee Fund, Salaries and Expenses, Summary Statement, Fiscal Year 1996, p. 12–13 (1995) (attached as Appendix A) (on file with the U.S. Department of Justice, Washington, D.C., the House Committee on Appropriations, Washington, D.C., and the Senate Committee on Appropriations, Washington, D.C.).[3]

Pursuant to this request, the fee increase proposal was included as section 111 of H.R. 2076, the Departments of Commerce, Justice, and State, the Judiciary, and related agencies appropriations bill for fiscal year 1996, which was favorably reported by the House Appropriations Committee on July 19, 1995. 141 Cong.Rec. D–881 (1995).[4] In the report accompanying H.R.2076, the Committee included the following explanation of section 111:

Decline in Bankruptcy filings.—The [Committee] recommendation assumes an overall decline in bankruptcy filings in 1996, as assumed in the budget.... The Committee understands that due to this decline, Chapter 11 filing fees which partially finance this program are anticipated to drop significantly. However, because cases with assets to administer often take two to three years, the pending caseload still in progress will require ongoing attention. The Committee recommendation includes an extension of the quarterly fee payments made under Chapter 11 to include the period after a reorganization plan has been confirmed by the Bankruptcy Court until the case has been dismissed (i.e., the post-confirmation period). Presently, quarterly fees are collected only until the plan of reorganization in the case is confirmed by the court. The additional fees will be·deposited as offsetting collections to the United States Trustee System Fund and will provide the resources necessary to ensure adequate post-confirmation oversight and supervision of Chapter 11 cases.

H.Rep. 104–196, 104th Cong., 1st Sess., at 16–17 (1995).

The House of Representatives passed H.R. 2076 on July 26, 1995. 141 Cong.Rec. H– 7791 (section 111 reprinted at 141 Cong.Rec. H–7635) (1995). The Senate Appropriations Committee in turn included identical fee language in its counterpart version of the bill, and .explained in its report: "As requested, the Committee recommendation includes an extension of the quarterly fee payments made under chapter 11 to include the period after a reorganization plan has been confirmed by the bankruptcy court until the case

---

**3.** The budget justification document also includes an estimate that $18.2 million in additional fees would be raised by the proposed statutory fee change. The court attempted to roughly correlate this projection with the number of post-confirmation cases that appear to have been in existence to generate it (approximately 53,000 as of September 30, 1994) in order to extrapolate the per case fee that might have been expected. However, because the projected revenue is significantly lower than would be realized even by collection of the minimum of $250 per quarter in each post-confirmation case, the court draws no conclusion from this information. The court assumes the $18.2 million projection is based on

the UST seeking to collect post-confirmation fees primarily in cases that seek a final decree, which, based on the published cases, appears to be the agency's practice. *In re Kroy (Europe) Ltd.,* 1997 WL 178857 (Bankr.D.Az.1997).

**4.** "SEC. 111. (a) Section 1930(a)(6) of title 28 United States Code, is amended by striking 'a plan is confirmed or'." Under the UST's statute, acceptance by Congress of this proposed fee increase provided sufficient funds for, and therefore endorsed, the UST's accompanying proposal to increase staff.

has been dismissed." Sen. Rep. 104–139, 104th Cong., 1st Sess. (1995). The Senate passed this measure on September 29, 1995. 141 Cong.Rec. S–14697 (1995).

The joint House–Senate conference committee, appointed to resolve the differing versions of H.R. 2076, included the following passages in its conference report:

> The conference agreement includes section 111 as proposed in the House and Senate bills, which extends the quarterly fee payments for debtors under Chapter 11 of the Bankruptcy Code to include the period from when a reorganization plan is confirmed by the Bankruptcy Court until the case is converted or dismissed. The conferees intend that this fee will apply to both pending and new cases.
>
> \* \* \*
>
> [T]he conferees agree to include an extension of post-confirmation quarterly fee payments made under Chapter 11 as proposed in both the House and Senate bills and expect that these fees will apply to all pending Chapter 11 cases with confirmed reorganization plans.

H.R.Conf.Rep. 104–396, 104th Cong., 1st Sess. (1995); 141 Cong.Rec. H–13894, 13899 (1995).

On December 6th and 7th, 1995, respectively, the House and Senate passed the conference report to H.R. 2076, clearing the measure for the President. 141 Cong.Rec. H–14112, S–18183 (1995). President Clinton vetoed the measure [5] on December 19, 1995, and the House's override effort failed. 142 Cong.Rec. H–33 (1996).

The conflict over H.R. 2076 took place within the context of the comprehensive and well publicized budget battle between the President and Congress that resulted in a number of government shutdowns and required thirteen short term appropriations measures.[6] One such short term measure was H.R. 2880, the Balanced Budget Downpayment Act, I, Pub.L. 104–99 (1996). Section 211 of H.R. 2880 incorporated by reference the UST quarterly fee amendment included in section 111 of the vetoed H.R. 2076, the Commerce, Justice, State, Judiciary Appropriations conference report.[7] On

---

5. The President's veto was unrelated to the UST fee amendments contained within the measure. *See* President's Veto Message to Congress, 141 Cong.Rec. H–15166–67 (1995).

6. The annual appropriations process for Fiscal year 1996 required Congress to pass thirteen interim spending bills and resulted in partial to complete government shutdowns for twenty-seven days. The thirteen interim spending bills, as well as the final omnibus legislation, are as follows: H.J.Res. 108, Pub.L. 104–31, provided funding from October 1, 1995, to November 13, 1995; H.J.Res. 123, Pub.L. 104–54, provided funding from November 19, 1995, to November 20, 1995; H.J.Res. 122, Pub.L. 104–56, provided funding from November 20, 1995, to December 22, 1995; H.J.Res. 136, Pub.L. 104–69, provided funding from December 22, 1995, to January 3, 1996, covering only Veterans Affairs, Aid to Families with Dependent Children and foster care payments and spending for the District of Columbia; H.J.Res. 153, Pub.L. 104–90, provided funding from January 3, 1996, to January 25, 1996, covering only Veterans Affairs, Aid to Families with Dependent Children and foster care payments and spending for the District of Columbia; H.R. 1358, Pub.L. 104–91, provided funding for certain programs; H.R. 1643, Pub.L. 104–92, provided funding from January 6, 1996, to January 25, 1996, for a broad group of government programs; H.J.Res. 134, Pub.L. 104–94, provid-

ed funding from January 6, 1996, to January 25, 1996, for all government programs if the President submits a seven-year balanced budget plan that uses Congressional Budget Office scoring; H.R. 2880, Pub.L. 104–99, provided general government funding from January 27, 1996, to March 15, 1996; H.J.Res. 163, Pub.L. 104–116, provided funding from March 15, 1996, to March 22, 1996; H.J.Res. 165, Pub.L. 104–118, provided funding from March 22, 1996, to March 29, 1996; H.J.Res. 170, Pub.L. 104–122, provided funding from March 29, 1996, to April 24, 1996; H.J.Res. 175, Pub.L. 104–131, provided funding from April 24, 1996, to April 25, 1996; H.R. 3019, Pub.L. 104–134, provided funding for the remainder of the fiscal year, from April 25, 1996, through October 1, 1996.

7. Section 211 in its entirety provides:

> Public Law 104–91 is amended by inserting after the words "the protection of the Federal judiciary" in section 101(a), the following: "to the extent and in the manner and", and by inserting at the end of the paragraph containing those words, but before the semicolon, the following: "*: Provided That, with the exception of section 114, the General Provisions for the Department of Justice included in [H.R. 2076, H.R.Conf.Rep. 104–378] are hereby enacted into law.*" (emphasis added.)

Referring in turn to the "General Provisions" for the Department of Justice in House Report

January 26, 1996, H.R. 2880 and its accompanying amendment to the UST quarterly fee statute, 28 U.S.C. § 1930(a)(6), became law.

### d. September 1996 Clarifying Amendment:

Following its enactment, a number of bankruptcy courts refused to apply the January amendment to cases with plans confirmed prior to the amendment's effective date, January 27, 1996.[8] Congress resolved this issue by enactment of a second clarifying amendment, which became effective September 30, 1996. In section 109 of H.R. 3019, the Omnibus Consolidated Appropriations Act for Fiscal Year 1997, Pub.L. 104–208, 110 Stat. 3009 (1996), Congress powerfully clarified its intent that the amended version of section 1930(a)(6) apply to all pending cases, even those with plans confirmed prior to the January amendment's effective date. Section 109(d) states: "[N]otwithstanding any other provision of law, the fees under 28 U.S.C. § 1930(a)(6) shall accrue and be payable from and after January 27, 1996, in all cases (including without limitation, any cases pending as of that date), regardless of confirmation status of their plans."[9] Section 109(a) of the September, 1996, amendment also includes an across-the-board increase in section 1930(a)(6) fees, another item requested by the Executive to further offset declining UST fees. H.Rep. 104–676, 104th Cong., 2d Sess. (July 16, 1996).

104–378, which the above language incorporated by reference, section 111 states as follows: "Section 1930(a)(6) of title 28, United States Code, is amended by striking the words 'a plan is confirmed or'."

Public Law 104–91, the point of reference at the beginning of section 211, is a reference to H.R. 1358, a bill to provide for the conveyance of a National Marine Fisheries Service Laboratory at Gloucester, Massachusetts. This bill was conscripted into service in the ongoing budget battle, serving as a legislative vehicle for one of the short term funding measures, commonly known as continuing resolutions. Included within the continuing resolution attached to H.R. 1358 was a general provision continuing funding for a broad array of law enforcement and judicial programs normally funded within the Commerce, Justice, State, and Judiciary appropriations bill. This general funding provision did not adopt the

## DISCUSSION

### a. Statute.

The court begins its review with the words of the statute itself. The statute appears to assess a quarterly fee against "the parties commencing a case under title 11...." This is somewhat ambiguous, however, due to the break in the cadence of the statute. The statute begins with a list of five categories of fees which "the parties commencing a case under title 11 shall pay to the clerk" of the court. The sixth category of fees under section 1930(a) is the UST quarterly fee. Here the language of the statute changes somewhat, directing that, "[i]n addition to the filing fee to be paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11...." Although the statute does not specify the entity responsible for paying the fee, nothing in the statute indicates a departure from the initial focus on "the parties commencing a case under title 11," as set forth at the beginning of the series.

Under the statute, fees are calculated based on disbursements. The term disbursements is not defined in the statute and is susceptible to a number of possible meanings. Nothing in the statute, however, indicates disbursements are to be limited to those made by the bankruptcy estate or are to exclude disbursements made by a reorganized debtor with an open case before the bankruptcy court.

amendment to 28 U.S.C. § 1930(a)(6) included in section 111 of the general provisions of the Commerce, Justice, State, and Judiciary appropriations bill. Therefore, the above further legislative action was required.

8. *In re Beechknoll Nursing Homes, Inc.*, 202 B.R. 260 (Bankr.S.D.Ohio 1996); *In re CF&I Fabricators of Utah, Inc.*, 199 B.R. 986 (Bankr.D.Utah 1996); *In re Hudson Oil Co. Inc.*, 200 B.R. 52 (Bankr.D.Kan.1996); *In re Precision Autocraft, Inc.*, 197 B.R. 901 (Bankr.W.D.Wash.1996).

9. The conference report further explains: "Sec. 109.—The conference agreement includes section 109 as proposed in the Senate bill ... which amends a provision included in the 1996 Appropriations Act, to clarify that fees collected under post-confirmation status are to be assessed in all pending chapter 11 cases."

■ Fees terminate under the statute at the conversion of the case to another chapter of the bankruptcy code or at dismissal of the case. Although not expressly stated in the statute, closure of a case after entry of a final decree is also an event that terminates quarterly fees because the existence of a case is a statutory precondition to the assessment of such fees.

■ Finally, in its September, 1996, clarifying amendment, Congress included a "notwithstanding" provision. This sweeping provision overrides any statutory provision that might be inconsistent with the provision Congress seeks to enact. Thus, regardless of any statute to the contrary, UST quarterly fees are due in all pending and newly filed chapter 11 cases from January 27, 1996, even cases with plans confirmed prior to that date.

■ Although not perfectly luminescent or free of potential contradictions, the statute standing alone is sufficiently clear to resolve this case. If the language of the statute is clear, the court should follow that language, rather than "isolated excerpts from the legislative history." *Patterson v. Shumate,* 504 U.S. 753, 761 n. 4, 112 S.Ct. 2242, 2248 n. 4, 119 L.Ed.2d 519 (1992). The exception to this rule of statutory construction is when "the plain language of the statute would lead to 'patently absurd consequences,' that 'Congress could not possibly have intended,' we need not apply the language in such a fashion." *Public Citizen v. United States Dept. of Justice,* 491 U.S. 440, 470, 109 S.Ct. 2558, 2575, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring) (quotations and internal citations omitted).

### b. Pre-amendment Case Law.

The bankruptcy court appears to have been heavily influenced by dicta in the Ninth Circuit's 1994 *Victoria Farms* decision.

There the court read the term "disbursements" broadly "to include *all* payments made by the *bankruptcy estate.*" 38 F.3d at 1534 (emphasis added). The bankruptcy court, stating that "disbursements" is a term of art, seized upon the Ninth Circuit's reference to the "bankruptcy estate." On the basis of this sentence, the bankruptcy court concluded "disbursements" under the statute must be limited to those made by the bankruptcy estate.

This interpretation is hampered by a number of factors, primarily that the *Victoria Farms* decision predated Congress' amendment to section 1930(a)(6). Prior to January 27, 1996, the statute did not allow post-confirmation fees. It is not surprising that, in 1994, the Ninth Circuit would limit disbursements to those made by the bankruptcy estate, the relevant entity under the pre-amendment regime. However, to rely heavily upon that interpretation after Congress amended the statute, fundamentally altering its scope, is questionable.

> Clearly in *Victoria Farms,* the Ninth Circuit addressed the issue of preconfirmation fees alone and could not have known that the fee would later be extended to postconfirmation periods. To attribute substantive meaning to the phrase "of the estate" is to impute an intention to the Court which it simply could not have formed in the circumstances as they existed at that time.

*In re Sedro–Woolley Lumber Co., Inc.,* 209 B.R. 987, 989 (Bankr.W.D.Wash.1997).

Moreover, as the UST points out, despite the bankruptcy court's reliance upon *Victoria Farms* to limit the scope of the newly amended section 1930(a)(6), the *Victoria Farms* decision interpreted the fee statute broadly to include *all* disbursements made by the bankruptcy estate.[10] In the two other recent

**10.** Both parties argue Congress is presumed to be aware of and endorse court decisions. *United States v. Hunter,* 101 F.3d 82, 85 (9th Cir.1996). Both argue, based on this principle, Congress was aware of and endorsed the *Victoria Farms* decision when the statute was amended. The UST argues Congress thereby adopted *Victoria Farms'* broad reading of the term disbursements. Boulders in turn argues Congress thereby endorsed *Victoria Farms'* view that disbursements

are limited to those made by the bankruptcy estate. Given that these two interpretations verge on being mutually exclusive, the court finds them to be of little assistance. The court further notes that *Victoria Farms* had only been cited by one bankruptcy court prior to congressional fee amendment at issue here. That court cited the case in support of an expansive reading of the term disbursements. *In re Meyer,* 187 B.R. 650 (Bankr.W.D.Mo.1995). Since the enactment

cases where the Ninth Circuit has been called upon to construe the scope of a trustee fee, the court has rejected arguments to limit the scope of the fee. *Endy*, 104 F.3d at 1157; *In re Fulkrod*, 973 F.2d 801, 803 (9th Cir.1992) (per curiam).

### c. Legislative Authority.

Congress selected a very complex statute within which to accomplish its apparent goal of raising revenue. Given the high degree of statutory harmonization that must accompany nearly any proposed amendment to this intricate code, it is not surprising that a number of bankruptcy courts reviewing this newly altered statutory scheme have pronounced it to be incompatible with a series of independent bankruptcy code provisions. Nor is it surprising that a number of these same courts have determined the amendment to constitute the modification of a private contract (i.e., the confirmed plan of reorganization).

■ These observations, accurate as they may be, do not diminish the congressional authority to enact such a statute or the judicial duty to give it effect. In its September clarifying amendment, Congress began with the words "notwithstanding any other provision of law." This sweeping language can only be read to evidence Congress' intent that the amendment override any inconsistent statute, including any contrary provision of the bankruptcy code.

As we have noted previously in construing statutes, the use of such a "notwithstanding" clause clearly signals the drafter's intention that the provisions of the "notwithstanding" section override conflicting provisions of any other section. Likewise, the Courts of Appeals generally have "interpreted similar 'notwithstanding' language ... to supersede all other laws, stating that '[a] clearer statement is difficult to imagine.'"

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, 113 S.Ct. 1898, 1903, 123 L.Ed.2d 572 (1993) (citations and internal quotations omitted).

■ Similarly, Congress possesses the authority to modify private contracts, governed only by the Fifth Amendment's prohibition on the taking of property without just compensation. The Supreme Court has frequently confirmed that Congress "undeniably, has authority to pass legislation pertinent to any of the powers conferred by the Constitution however it may operate collaterally or incidentally to impair or destroy the obligation of private contracts." *Continental Illinois Nat. Bank & Trust Co. of Chicago v. Chicago, Rock Island & P. Ry. Co.*, 294 U.S. 648, 680, 55 S.Ct. 595, 608, 79 L.Ed. 1110 (1935).

■ More recently, the Court set forth the appropriate inquiry in such cases:

To prevail on a claim that federal economic legislation unconstitutionally impairs a private contractual right, the party complaining of unconstitutionality has the burden of demonstrating, first, that the statute alters contractual rights or obligations. If an impairment is found, the reviewing court next determines whether the impairment is of constitutional dimension. If the alteration of contractual obligations is minimal, the inquiry may end at this stage; if the impairment is substantial, a court must look more closely at the legislation. When the contract is a private one, and when the impairing statute is a federal one, this next inquiry is especially limited, and the judicial scrutiny quite minimal. The party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and establish that the legislature has acted in an arbitrary and irrational way.

*National R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co.*, 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432, (1985) (internal quotations and citations omitted).

### d. Interpretation of Legislative History.

The legislative history set forth in detail above supports extending post-confirmation

---

of the January amendment, except for one case (*In re Flatbush Assoc.*, 198 B.R. 75 (Bankr. S.D.N.Y.1996) (citing *Victoria Farms* as authority for expansive reading of "disbursements")), *Victoria Farms* has been cited only in connection with fee cases such as this.

fees to reorganized debtors. It also supports including distributions made by reorganized debtors in estimating the proper fee and strongly indicates Congress sought to raise revenue in the face of declining bankruptcy fees. Congress, at the urging of the Administration, sought to obtain this revenue by closing a statutory loophole that exempted post-confirmation debtors from paying quarterly fees.

The House report to H.R. 2076 refers to a significant decline in chapter 11 filing fees, and to the fact that "the pending caseload still in progress will require ongoing attention," as the committee's rationale for extending quarterly fee payments to "the post-confirmation period." H.Rep. 104–196, 104th Cong., 1st Sess. at 16–17 (1995). Later in the process, the House–Senate conference report referred to the provision as extending "the quarterly fee payments for *debtors* ... to include the period from when a reorganization plan is confirmed ... until the case is converted or dismissed. [T]his fee will apply to both pending and new *cases*." H.R.Conf. Rep. 104–396, 104th Cong., 1st Sess. (1995) (emphasis added).

Finally, in its clarifying amendment, Congress stated: "*Notwithstanding any other provision of law,* the fees under 28 U.S.C. § 1930(a)(6) shall accrue and be payable from and after January 27, 1996, *in all cases* (including without limitation, any *cases* ending as of that date), regardless of confirmation status of their plans." Pub.L. 104–208, § 109(a) (emphasis added).

■ The bankruptcy court's decision is faithful to the legislative intent in that it would allow the amended statute to raise some additional post-confirmation fee revenue. However, by limiting fees to distributions by the commonly defunct bankruptcy estate, the decision essentially creates a flat fee at the minimum level of $250 per quarter in the vast majority of cases. Nothing in the legislative history supports such a conclusion.[11]

It is apparent that Congress sought to raise revenue through this statutory change. It would be unreasonable to assume that, even though it accepted the amendment suggested by the Administration, Congress harbored an unstated intention that post-confirmation fees would be limited to a flat fee of $250 per quarter. In connection with its September clarifying amendment, Congress also included an across-the-board increase in the § 1930(a)(6) fee schedule, further evidence of its revenue raising intent.

The bankruptcy court struggled to reconcile the confirmed plan with the new statute. As a basis for its refusal to base quarterly fees upon distributions made by the reorganized debtor, the bankruptcy court focused on language in the confirmed plan that required the property of the bankruptcy estate to vest free of all claims in Boulders on the effective date of the plan. Next, however, the bankruptcy court directed Boulders to pay the quarterly fee, citing the statute's requirement that fees are due in each case. The court also calculated the fee based on distributions made by the bankruptcy estate, an entity that had ceased to exist.

Congress, for better or worse, did not make such fine distinctions about the required origin of the "distributions" or about the entity responsible for quarterly fees at any given stage of a case. Rather, Congress referred more generally to fees collected in "cases" or to fees paid by "debtors" after a plan had been confirmed. The statute refers to "the parties commencing a case." The

11. The UST argues Congress considered and rejected a flat fee approach. As authority for this position, the UST cites a House report from 1986 which indicates Congress considered and rejected a range of mechanisms for calculating section 1930(a)(6) fees, including institution of a flat fee. Equally valid, however, is the proposition that Congress, at the same time, considered and rejected fees on post-confirmation debtors, the very fee mechanism the UST urges here. The fact that the 99th Congress considered and rejected a certain legislative approach is not necessarily authority for the proposition that the 104th Congress was of the same mind. Likewise flawed is Boulders' attempt to carry forward the 1986 statements of Senator Dennis DeConcini regarding the UST quarterly fee statute that UST fees should match the oversight services rendered by the UST. 131 Cong.Rec. S–11780, 99th Cong., 1st Sess. (1985). Such statements are of minimal assistance in interpreting an amendment to that very statute by a subsequent and independent session of Congress.

absence of legislative history supporting more precise congressional distinctions within the statute, such as references to the "bankruptcy estate" or the "reorganized debtor," significantly undermines the bankruptcy court's conclusion that such distinctions were intended.

Boulders, in its brief and the materials appended to it, raises a series of objections to the newly amended fee statute.[12] One such objection is that the amendment would impermissibly modify the terms of the confirmed plan, a private contract, in violation of bankruptcy code and the vested contractual rights of the parties to the plan.[13] The bankruptcy court here indirectly credited that issue by noting the confirmed plan vested all property from the bankruptcy estate in Boulders free of all claims, and that nothing appeared to supersede that grant. *Boulders*, 205 B.R. at 951.

The bankruptcy code includes detailed procedures for modification of confirmed plans.[14] These procedures were not utilized in this case. As is apparent from the preceding analysis, however, this objection is without merit. Neither the plan modification provisions of the bankruptcy code nor the terms of a private contract are effective barriers. Congress has the authority to override existing statutes and impair private contracts.[15]

Boulders argues that Congress intended the fees at issue here to be user fees. Because the UST is rarely involved in post-confirmation oversight, the argument continues, collection of user fees during that period is unfair and contrary to the intent of Congress.

Such a reading of congressional intent would require this court to disregard the plain language of the amended statute as well as the legislative intent accompanying it. The UST's budget justifications make it especially clear that the amendment would usher in new post-confirmation monitoring by the UST. The statute can now be read to impose such a duty upon the UST. Even if the statute or the legislative history required a correlation between the effort put forth by the UST in a case and the quarterly fee received, which this court does not accept, the statute's apparent creation of a new post-confirmation duty would make such a fee reasonable.

Boulders questions the statute's potential to assess fees in perpetuity. Boulders argues that, because fees under the statute now terminate only on conversion or dismissal of a case, fees in cases that merely close could go on forever. It is apparent from the legislative history that such an absurd result is not what Congress intended. When the plain language of a statute results in "patently absurd consequences" not intended by Congress, the court is not required to apply the language in such a fashion. *Public Citizen*, 491 U.S. at 470, 109 S.Ct. at 2575.

---

12. A number of issues raised in the materials accompanying Boulders' brief are not fairly raised here. Several bankruptcy court decisions in the months following enactment of the January amendment objected to the retroactive application of the amendment. The September amendment resolved this issue and the parties here do not raise it. Likewise, a number of courts, after concluding the new statute applies to the reorganized debtor's disbursements, have struggled with whether to subject all disbursements to the fee, or only those pursuant to the confirmed plan. This issue is not raised here and the court need not address it.

13. The court in *In re Salina Speedway, Inc.*, 210 B.R. 851, 854 (10th Cir. BAP 1997 (Okla.)) cited a number of contradictory provisions within the code, including 11 U.S.C. § 1129(a)(12) (requiring a plan to provide for the payment of all section 1930 fees on or before the effective date of the plan); and 11 U.S.C. § 1141 (describing the binding effect of a confirmed plan). These inconsistent code provisions are overcome by the "notwithstanding" clause in the September amendment.

14. 11 U.S.C. § 1127(b) allows only the plan proponent or the reorganized debtor to modify the plan post-confirmation and before substantial consummation of the plan.

15. The new statutory obligation to pay post-confirmation fees also arose by operation of law. *Holywell Corp. v. Smith*, 503 U.S. 47, 112 S.Ct. 1021, 117 L.Ed.2d 196 (1992) (duty of liquidating trustee, appointed to chapter 11 plan, to pay taxes on income generated by estate arose by operation of law). It is insignificant that, as some courts have asserted, the taxes in *Holywell* arose separately from the bankruptcy or that they were enforced by an entity separate from the bankruptcy. *In re Lancy*, 208 B.R. 481, 485 (Bankr.D.Az.1997).

Also, by the terms of the statute, fees are owed for each *case*. The existence of a case is a precondition to the assessment of fees. Upon closure, the case ceases to exist as does the obligation to pay fees. Moreover, because the UST here is seeking only fees for the second quarter of 1996, the court need not resolve this controversy.

**e. Conclusion.**

 Based on the language of the statute and its legislative history, the court respectfully concludes the bankruptcy court erred in interpreting the amended statute to assess post-confirmation fees only against the bankruptcy estate. This court is convinced Congress intended to extend the post-confirmation fees to the reorganized debtor based on distributions made by the reorganized debtor. The reorganized debtor remains a commencing party in a case pending before the bankruptcy court. Until the case is converted, dismissed or closed, the statute requires such a party to pay quarterly fees based on distributions made in the case.

*JURISDICTION*

The court next considers whether the bankruptcy court had jurisdiction to consider this matter, and, if so, whether it properly conditioned entry of a final decree upon payment of the proper fee. Although neither the bankruptcy court nor the parties here addressed these issues, questions remain which this court will address on its own motion.

A number of bankruptcy courts addressing the fee issue now before this court have concluded they lack either an enforcement mechanism or jurisdictional authority over such matters when they arise after a plan has been confirmed by the bankruptcy court. *See, e.g., In re Indian Creek Limited Partnership,* 205 B.R. 609, 612 (Bankr.D.Ariz. 1997) ("To the extent that the United States Trustee can assert its post-confirmation claim, it must assert and liquidate such a claim just as any other post-confirmation creditor would in an appropriate non-bankruptcy forum."); *In re Gryphon at the Stone Mansion,* 204 B.R. 460, 464 (Bankr.W.D.Pa. 1997) ("The jurisdiction of the bankruptcy court after confirmation of a chapter 11 plan is normally limited to matters concerning the implementation or execution of the confirmed plan.... [T]he United States Trustee must pursue its claim in another forum, as must any other creditor who acquires its claim after a chapter 11 plan has been confirmed.") (internal quotation omitted).

The current jurisdictional framework of bankruptcy courts reflects the concerns expressed by the Supreme Court in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which held unconstitutional the jurisdictional provisions of the Bankruptcy Reform Act of 1978 (the "1978 Act"), Pub.L. 95-598, 92 Stat. 2549. The 1978 Act created bankruptcy courts and vested in them jurisdiction over all "civil proceedings arising under title 11 or arising in or related to cases under title 11." 28 U.S.C. § 1471(b) (1976 ed., Supp. 1505 IV). The plurality in *Northern Pipeline* concluded that the 1978 Act was unconstitutional because it allowed non-Article III courts to "entertain and decide" state law claims that were merely "related to" the underlying bankruptcy case. 458 U.S. at 91, 102 S.Ct. at 2881–2882.

In response to *Northern Pipeline,* Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98-353, 98 Stat. 333. Pursuant to 28 U.S.C. § 1334(b), the district courts possess original but not exclusive jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." Title 28 U.S.C. § 157(a) provides that district courts may refer this title 11 jurisdiction to bankruptcy courts in "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or relating to a case under title 11."[16]

16. This court has referred title 11 cases to the bankruptcy court in this district pursuant to the 28 U.S.C. § 157(a). Rule 2100-1 of the Local Rules for the U.S. District Court for Oregon provides: "This court hereby continues its reference to the bankruptcy judges of this district of all cases under Title 11 and all proceedings arising under Title 11 or arising in or in relation to cases under Title 11."

Section 157 also establishes two broad categories of proceedings: "core proceedings" and "non-core proceedings." For "all core proceedings arising under title 11, or arising in a case under title 11," section 157(b)(1) permits bankruptcy courts to "hear and determine" the proceedings and to "enter appropriate orders and judgments." However, in non-core proceedings otherwise related to cases under title 11, section 157(c)(1) allows bankruptcy courts to hear the proceedings and then submit proposed findings of fact and conclusions of law to the district court.

Ninth Circuit cases suggest there are two general categories of core [17] proceedings: (1) those "arising under" title 11 and (2) those "arising in" title 11. *In re Harris Pine Mills,* 44 F.3d 1431, 1435 (9th Cir.1995), *cert. denied,* 515 U.S. 1131, 115 S.Ct. 2555, 132 L.Ed.2d 809 (1995). Proceedings "arising under" title 11 "involve a cause of action created or determined by a statutory provision of title 11." *Id.* (quotation omitted). Proceedings "arising in" title 11 "seems to be a reference to those administrative matters that arise only in bankruptcy cases.... [They] are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Id.* (quotation omitted).

Here, the UST's claim to collect fees is based on 28 U.S.C. § 1930(a)(6), and therefore does not "arise under" title 11. It does, however, appear to fit within the Ninth Circuit's description of "arising in" jurisdiction. This issue is an administrative matter that, by its very nature, exists because the bankruptcy case filed by Boulders remained an open case on the bankruptcy court's docket

during the second quarter of 1996. Based on the jurisdictional statute and the case law, the fee issue presented here arises in a title 11 case and is therefore a core proceeding squarely within the jurisdiction of the bankruptcy court.

Even if the present issue were to fall short of satisfying the requirements of a core proceeding, the bankruptcy court's more inclusive "related to" jurisdictional authority over non-core proceedings would have sufficed. A non-core proceeding "does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy." [18] *Id.* (quotation omitted).

The Ninth Circuit's test for determining whether a matter is "related to" the bankruptcy:

> is whether the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.... Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate. [19]

*In re Fietz,* 852 F.2d 455, 457 (9th Cir.1988) quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984).

The Supreme Court has also suggested a broad reading of the "related to" jurisdiction:

---

**17.** Section 157(b)(2) sets forth a non-exclusive list of proceedings Congress deemed to be core proceedings. While the fee issue here does not fit within any of the listed categories, the list, by its terms, is non-exclusive.

**18.** The distinction between "arising in" and "related to" jurisdiction appears to turn on whether the matter could exist outside the bankruptcy. It could be argued that the fee issue asserted here could exist outside the bankruptcy for the purposes of enforcement. It could also be argued the issue exists only in the bankruptcy because that is where it was created. The court need not decide within which category the present matter falls, but simply notes it cannot fall in both.

**19.** Boulders would place extra emphasis on the words "bankruptcy estate." As discussed above, one of the effects of the 1996 amendments was to create the argument, inadvertently in this court's view, that the words "bankruptcy estate," previously uncomplicated words of inclusion, had been transformed into abrupt words of exclusion. In reviewing decisions that predate the 1996 amendments, this court avoided placing on these words more significance, particularly in terms of their ability to limit, than these earlier courts could have intended at the time. *In re Keating Co.,* 205 B.R. 663, 667 (Bankr.D.Mass.1997).

Congress did not delineate the scope of "related to" jurisdiction, but its choice of words suggests a grant of some breadth. The jurisdictional grant in § 1334(b) was a distinct departure from the jurisdiction conferred under previous acts, which had been limited to either possession of property by the debtor or consent as a basis for jurisdiction. *See* S.Rep. No. 95–989, 2nd Sess., pp. 153, 154 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5939, 5940. We agree with the views expressed by the Court of Appeals for the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984), that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal *efficiently and expeditiously with all matters connected with the bankruptcy estate,*" ... and the "related to" language in § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simple proceedings involving the property of the debtor or the estate.

*Celotex Corp. v. Edwards,* 514 U.S. 300, 307–308, 115 S.Ct. 1493, 1498–1499, 131 L.Ed.2d 403 (1995) (citation omitted) (emphasis added).

Based on the foregoing, the court concludes the quarterly fee question now before the court constitutes a core proceeding because it arises in a title 11 case. In the alternative, the matter falls within the more inclusive category of "related to" jurisdiction available to bankruptcy courts over non-core matters. Of all the potential forums for resolution of such an issue, the bankruptcy court that presided over this case for four years would appear to be the best suited to "deal efficiently and expeditiously" with the matter. *Id.* Moreover, none of the concerns expressed by the Supreme Court in *Northern Pipeline* about pendent state claims

which gave rise to the jurisdictional distinction between core and noncore proceedings appear to arise here.[20]

Consistent with this interpretation of the jurisdictional statute, the plan of reorganization in this case also supports jurisdiction in the bankruptcy court. In particular, paragraph XIIF of the plan provides that any causes of action that "subsequently arise under any of the provisions of the Code or which may be enforceable under any of the provisions of the Code, *or any other law or statute,* shall be preserved *and this Court shall retain jurisdiction to dispose of such causes of action.*" (emphasis added). Moreover, paragraph XI of the plan specifically preserves jurisdiction in the bankruptcy court over "Administrative Claims," which the plan defines to include "any fees or charges assessed against the estate of a debtor under Chapter 123, Title 128, United States Code, § 1930."

The above analysis exposes an ample selection of jurisdictional bases available to the bankruptcy court in this matter.

A number of bankruptcy courts have declined to condition the issuance of a final decree closing a case upon a reorganized debtor's payment of section 1930(a)(6) post-confirmation quarterly fees. *See, e.g., Indian Creek,* 205 B.R. at 611. These courts cite Rule 3022 of the Federal Rules of Bankruptcy Procedure, which requires: "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, *shall* enter a final decree closing the case." However, among the factors to be considered by a court in determining if an estate has been *"fully administered,"* indicating the case must be closed, is "whether all motions, contested matters, and adversary proceedings have been finally resolved."[21] Fed.

---

**20.** If indeed its authority to hear this case was based on "related to" jurisdictional authority, the bankruptcy court failed to follow the required procedural steps, namely submission to this court of proposed findings of fact and conclusions of law. Rather, the bankruptcy court entered a memorandum opinion and order requiring payment of the minimum quarterly fee as a precondition to entry of a final decree closing the case. If it in fact was made, such an error was

harmless. To the extent necessary, this court construes the bankruptcy court's order as proposed findings of fact and conclusions of law.

**21.** The 1991 Advisory Committee Note to Rule 3022 advises:

Entry of a final decree closing a chapter 11 case should not be delayed solely because the payments required by the plan have not been completed. Factors that the court should con-

R.Bankr.Pro. 3022 (emphasis added); 11 U.S.C. § 350(a).

The court concludes the UST quarterly fee issue constitutes a contested matter or an adversary proceeding that had not been finally resolved.

These courts also refuse to withhold entry of a final decree based on a lack of authority to order the payment of the fees. They correctly note the absence of a specific statute authorizing bankruptcy court to order the collection of post-confirmation claims. They also note their post-confirmation jurisdiction is generally limited to plan oversight matters. Once the plan is confirmed, the bankruptcy estate ceases to exist and its property vests elsewhere (with the reorganized debtor in this case) free of claims.

■■■ The issue here, however, despite the bankruptcy court's decision, is not a claim against the former bankruptcy estate. Rather, the statute assesses fees against the party filing the case. The court notes that section 1930(a)(6) has generally and correctly been interpreted to require the bankruptcy estate to pay the quarterly fees prior to plan confirmation. This practice should not, however, prevent assessment of quarterly fees against the entity primarily identified by the statute, "the part[y] commencing a case," who remains before the court, now as a reorganized debtor. Although it may present practical questions regarding the court's ability to compel payment of the fee, continuing direct authority by the bankruptcy court over the property of the estate is not a precondition to assessment of a fee against a party before the court.

■■■ This is at some level a discretionary issue for each bankruptcy court. In exercising such discretion, the bankruptcy court should be counseled by the congressional intent behind the jurisdictional statute for the bankruptcy courts, which indicates such courts are to provide a forum for the efficient and expeditious consideration of bankruptcy matters. Although it may not have been required to do so, the bankruptcy court did not err in conditioning entry of a final decree on final resolution of this contested fee matter.

## CONCLUSION

Based on the foregoing, the decision of the bankruptcy court is hereby reversed and this case is remanded for proceedings consistent with this order.

---

sider in determining whether the estate has been fully administered include (1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved.

The court should not keep the case open only because of the possibility that the court's jurisdiction may be invoked in the future. A final decree closing the case after the estate is fully administered does not deprive the court of jurisdiction to enforce or interpret its own orders and does not prevent the court from reopening the case for cause pursuant to § 350(b) of the Code. For example, on motion of a party in interest, the court may reopen the case to revoke an order of confirmation procured by fraud under § 1144 of the Code. If the plan or confirmation order provides that the case shall remain open until a certain date or event because of the likelihood that the court's jurisdiction may be required for specific purposes prior thereto, the case should remain open until that date or event.

# APPENDIX A

## United States Trustee System Fund
### Salaries and Expenses
### Summary Statement
### Fiscal Year 1996

The United States Trustee System Fund ("the Fund") requests a total of 1,199 permanent positions (including 232 attorneys), 1,118 workyears, and $109,245,000 for 1996. The request includes 799 positions (142 attorneys), 761 workyears, and $65,054,000 in direct authority and 400 positions (90 attorneys), 357 workyears and $44,191,000 in offsetting collections.

The 1996 request represents a net increase of 55 positions (20 attorneys), 28 workyears and $2,172,000 over the Program's 1996 base funding level. The increase is funded entirely through offsetting collections. No increase in the direct appropriation for the Program is requested.

**PROGRAM MISSION:** The United States Trustee Program acts in the public interest to promote the efficiency and to protect and preserve the integrity of the bankruptcy system. It works to secure the just, speedy, and economical resolution of bankruptcy cases; monitors the conduct of parties and takes action to ensure compliance with applicable laws and procedures; identifies and investigates bankruptcy fraud and abuse; and oversees administrative functions in bankruptcy cases.

The Program carries out its mission through two basic areas of responsibility. The first is the non-discretionary tasks of providing administrative support to expeditiously move the tremendous volume of bankruptcy cases through the bankruptcy process. The second focuses on ensuring that private trustees and debtors adhere to the standards of the law, while policing for embezzlements and other improper conduct.

**HISTORICAL PERSPECTIVE:** The Bankruptcy Reform Act of 1978 established the United States Trustee Program on a pilot basis in 18 Federal judicial districts. In 1986, the Congress enacted the Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986 (P.L. 99-554) expanding the United States Trustee Program to 88 Federal judicial districts. The major thrust of these nationwide reforms was to separate the adjudicative and administrative functions in bankruptcy cases, relieving the courts of the administrative burdens of the system. Congress established one agency with responsibility for the administration of bankruptcy estates and, as stated in the House Report at the time of passage of the Bankruptcy Reform Act of 1978, to "serve as bankruptcy watchdogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena" (H. Rpt. 595, 95th Cong., 1st sess. (1977)). With the enactment of the Bankruptcy Reform Act of 1994 (P.L. 103-394), Congress strengthened the criminal penalties for fraud in the bankruptcy system.

The Program has expended substantial efforts to create structures of accountability with regard to private trustees appointed to administer bankruptcy estates and with regard to debtors. Despite these efforts, both the Office of Management and Budget (OMB) and the Department of Justice Inspector General have recognized the need to increase supervision in the area of trustee oversight. Judges also cite the need to police debtors-in-possession in chapter 11 reorganization cases in the large number of those cases without active creditor interest. Moreover, the Congress has continued to stress the need for enhanced oversight, specifically as it relates to the Program's fundamental obligation to review the applications for fees of trustees and professionals and to ensure that they are appropriate and proper. The demand that trustees and professionals perform services for the bankruptcy estate that do not unnecessarily drain its assets is rooted in public policy and is a foundation of the law.

-2-

Bankruptcy is a public process. The perception that self-interest is pursued to the detriment of a fair and efficient resolution process has a legitimate premise. Whether it be private trustees who betray their fiduciary duties, debtors who ignore their statutory obligations, or professionals who pursue primarily only their own financial reward, the number of such incidents is significant. Any government process is ultimately dependent upon public confidence. The challenges the Program faces require additional effort to maintain and support the trust the law intends.

**1996 INITIATIVE:** For 1996, the Program requests an increase of 55 positions (20 attorneys), 28 workyears and $3,321,000 in offsetting collections to allow the Program to strengthen its chapter 11 case supervision and post confirmation oversight. The resources for the Program's chapter 11 responsibilities have been severely strained as existing resources were redirected to the high risk area of trustee mismanagement and debtor fraud. Yet, the chapter 11 reorganization case responsibilities are critical if the Program is to achieve its goal of maximizing the distribution of estate assets to creditors.

The public's apparent dissatisfaction with the high cost of bankruptcy threatens the continued viability of the entire bankruptcy system. It is essential that the Program provide the regulatory oversight necessary to bring cases to a faster resolution and that debtors with court confirmed reorganization plans fulfill their obligation to successfully implement those plans. The Program's ability to perform these responsibilities is aggravated by the time-consuming nature of the tasks and staffing shortages. The requested increase will address the need to provide greater chapter 11 case supervision, ensuring that chapter 11 debtors carry out the promises they have made to creditors and the bankruptcy court in exchange for the privilege of a reorganization and fresh financial start. The additional resources requested in 1996 will expedite the chapter 11 caseload and facilitate the return of estate funds back into the economy.

**PROGRAM DECREASE:** The 1996 request includes a program decrease of $1,149,000 in direct authority associated with the requirement that the 1996 cost-of-living allowance be absorbed. These reductions will be achieved through careful management of personnel resources and through reductions in non-personnel expenditures such as travel and transportation, printing, other services, supplies and equipment.

**U.S. TRUSTEE SYSTEM FUND:** The self-funding characteristic of the United States Trustee Program was a feature of Public Law 99-554 enacted on October 27, 1986. Two categories of fees generate almost all of the revenue for the United States Trustee System Fund. The first category is the filing fee paid at the inception of each case for chapters 7, 11, 12 and 13, which constitutes approximately 30 percent of the Program's funding. The second category, responsible for over 65 percent of Program funding, is the quarterly fees paid by chapter 11 debtors for which the amounts paid are determined by cash disbursement levels of the debtor.

Payment of excess percentage fees collected by chapter 12 or 13 standing trustees and interest on invested funds also generate revenue for the Fund. Revenue in the Fund that is not needed for current expenses is invested in Treasury securities, and the income so earned accrues to the Fund. This investment income, thus, increases the Fund's revenue and minimizes the financial burden on the users of the System.

The 1992 Appropriations Act ("the 1992 Act") amended the fee structure relative to chapter 11 bankruptcy cases, by increasing both the filing fees paid by debtors at the inception of the case, as well as the fee paid on a quarterly basis. The increased amounts paid by chapter 11 debtors are deposited in the Fund as offsetting collections. The 1992 Act established the authority to use the revenues generated from the increased fees to provide additional resources to support the Program. The offsetting collections funding provided an overall increase in necessary resources for the Program, while permitting a reduction in the 1992 direct appropriation. The increased chapter 11 fees generated $25,954,000 in 1992, $34,070,000 in 1993, but declined to $28,895,000 in 1994 as a result of a decline in the number of chapter 11 filings.

-3-

The intent of Congress in establishing the Fund was that user fees would completely finance the United States Trustee Program and not be used as a mechanism to generate revenues for the United States Treasury. However, section 589a of title 28 United States Code, provides that revenues in the Fund will transfer to the general treasury if the Fund exceeds a percentage of the Program's appropriation. On November 1, 1990, $6,398,000 was required to be transferred from the Fund to the general fund of the Treasury; on November 1, 1992, a transfer of $24,470,000 was required, and on November 1, 1993, the Program was required to transfer $15,287,000. No transfer was required in November 1994.

**USER FEE PROPOSAL:** The Program is proposing to fund its chapter 11 case supervision/post confirmation initiative through a proposed change in the law which would require chapter 11 debtors to continue to make quarterly payments based on disbursements while in the post confirmation stage until a case is converted or dismissed. Currently, such payments are made only until a plan of confirmation is confirmed by the bankruptcy court, making post confirmation debtors the only entities in the bankruptcy system who are exempt from fees. The change in the statute is estimated to raise an additional $18.2 million, which would fund the proposed enhancement and meet a projected shortfall in offsetting collections resulting from the decline in chapter 11 filings over the last 18 months.

It should be noted that while bankruptcy filings have decreased, that decrease has been relatively recent. Bankruptcy cases with assets to administer often take two to three years, or more, to run their course. Accordingly, while new case filings may be down, the pending caseload still in process remains substantial and requires ongoing attention. As a result, Program responsibilities in the administration of cases have not been significantly affected by the decline in filings. Moreover, the Program is strengthening its efforts to combat fraud, and there are new duties imposed by recent statutory amendments. Bankruptcy Fraud Task Forces are continuing to be formed in the regions to increase cooperation between the Program and other appropriate investigative and enforcement agencies such as the Federal Bureau of Investigation, the Internal Revenue Services and the Offices of the United States Attorneys.

These efforts continue to produce results. Criminal referrals grew by 26 percent from 1993-1994 and convictions are increasingly significant. For example --

- The Bankruptcy Fraud Task Force and the United States Trustee's Office in Chicago (Region 11) recently reported the return of 5 separate indictments charging 8 individuals with bankruptcy fraud and related charges. Four of the five task force indictments resulted from referrals by the United States Trustee's Office.

- In Philadelphia (Region 3), a debtor was indicted on 344 counts of bankruptcy fraud, false statements, bank fraud, money laundering, perjury and aiding and abetting. The debtor, charged with diverting more than half a million dollars in bankruptcy estate funds to his personal use, was the principal of more than 30 real estate partnerships that filed for bankruptcy. The debtor in this case pleaded guilty to charges of bankruptcy fraud, money laundering, bank fraud and perjury.

- In Region 16, the owner of the Los Angeles Kings hockey team pleaded guilty of four counts of criminal fraud after he sold a portion of his interest in the hockey team for $60 million prior to filing bankruptcy and formed a trust which allowed the continued control of assets as if the bankruptcy was non-existent.

The 1996 budget request and the proposed change in the language affecting the payment of quarterly fees will help to ensure that sufficient resources are available to continue the successful efforts to preserve the integrity of the bankruptcy system.

-4-

United States Trustee System Fund

Justification of Proposed Changes in Appropriation Language

The 1995 budget estimates include proposed changes in the appropriation language listed and explained below. New language is underscored and deleted matter is enclosed in brackets.

United States Trustee System Fund

For the necessary expenses of the United States Trustee Program, [$103,190,000], $109,245,000 as authorized by 28 U.S.C. 589a(a), to remain available until expended, for activities authorized by section 115 of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986 (Public Law 99-554), of which [$62,593,000] shall be derived from the United States Trustee $65,054,000 System Fund: Provided, That deposits to the Fund are available in such amounts as may be necessary to pay refunds due depositors: Provided further, That, notwithstanding any other provision of law, not to exceed [$40,597,000] of offsetting collections derived from fees $44,191,000 collected pursuant to section 589a(f) of title 28, United States Code, as amended [by section 111 of Public Law 102-140 (105 stat. 795)], shall be retained and used for necessary expenses in this appropriation: Provided further, That the [$103,190,000] herein appropriated shall be reduced as such offsetting $109,245,000 collections are received during fiscal year [1995], so as to result in a 1996 final fiscal year [1995] appropriation estimated at not more than 1996 [$62,593,000]: Provided further, That any of the aforementioned fees $44,191,000 collected in excess of [$40,597,000] in fiscal year [1995] shall $65,054,000 remain available until expended, but shall not be available for 1996 obligation until October 1, [1995]: Provided further, That of the offsetting collections credited to this account, $218,000 are permanently canceled].

(12 U.S.C. 1904b: Public Law 103-317, the Department of Justice and Related Agencies Appropriations Act, 1995

Explanation of changes

Language related to the one-time reduction for GSA rent is deleted.

-5-

United States Trustee System Fund
Salaries and expenses
Crosswalk of 1995 changes
(Dollars in thousands)

| Activity/Program | 1995 President's Budget Request | | | Congressional Appropriation Action on 1995 Request | | | Procurement and Rent Adjustments | | | Reprogrammings | | | 1995 Availability | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | WY | Amt. | Pos. | WY | Amt. | Pos. | WY | Amt. | Pos. | WY | Amt. | Pos. | WY | Amt. |
| **Direct Authority:** | | | | | | | | | | | | | | | |
| 1. Administration of Cases......... | 747 | 711 | $59,016 | ... | ... | ($3,070) | ... | ... | ($6) | ... | ... | ... | 747 | 711 | $55,940 |
| 2. Management and Administration.................. | 52 | 50 | 6,647 | ... | ... | ... | ... | ... | (1) | ... | ... | ... | 52 | 50 | 6,646 |
| Total.................. | 799 | 761 | 65,663 | ... | ... | (3,070) | ... | ... | (7) | ... | ... | ... | 799 | 761 | 62,586 |
| **Offsetting Collections:** | | | | | | | | | | | | | | | |
| 1. Administration of Cases......... | 361 | 328 | $38,644 | (18) | (9) | ... | ... | ... | ($224) | ... | ... | ... | 343 | 319 | $38,420 |
| 2. Management and Administration.................. | 2 | 2 | 1,953 | ... | ... | ... | ... | ... | (25) | ... | ... | ... | 2 | 2 | 1,928 |
| Total.................. | 363 | 330 | 40,597 | (18) | (9) | ... | ... | ... | (249) | ... | ... | ... | 345 | 321 | 40,348 |
| **Total Authority:** | | | | | | | | | | | | | | | |
| 1. Administration of Cases......... | 1,108 | 1,039 | $97,660 | (18) | (9) | ($3,070) | ... | ... | ($230) | ... | ... | ... | 1,090 | 1,030 | $94,360 |
| 2. Management and Administration.................. | 54 | 52 | 8,600 | ... | ... | ... | ... | ... | (26) | ... | ... | ... | 54 | 52 | 8,574 |
| Total.................. | 1,162 | 1,091 | 106,260 | (18) | (9) | (3,070) | ... | ... | (256) | ... | ... | ... | 1,144 | 1,082 | 102,934 |

-6-

United States Trustee System Fund
Salaries and Expenses
Summary of Requirements
(Dollars in thousands)

**Adjustments to base:**

| | Perm. Pos. | WY | Amount |
|---|---|---|---|
| 1995 enacted | 1,144 | 1,082 | $103,190 |
| Procurement and Rent Adjustments | ... | ... | (256) |
| 1995 availability | 1,144 | 1,082 | 102,934 |
| Mandatory increases | ... | 8 | 4,869 |
| Decreases (automatic, non-policy) | ... | ... | (730) |
| 1996 base | 1,144 | 1,090 | 107,073 |
| Program changes (see program narrative for details) | 55 | 28 | 2,172 |
| 1996 estimate | 1,199 | 1,118 | 109,245 |

| Estimates by budget activity | 1995 Availability | | | 1996 Base | | | 1996 Estimate | | | Increase/Decrease | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Perm Pos. | WY | Amount | Perm Pos. | WY | Amount | Perm Pos. | WY | Amount | Perm Pos. | WY | Amount |
| **Direct Authority:** | | | | | | | | | | | | |
| 1. Administration of Cases | 747 | 711 | $55,940 | 747 | 711 | $59,197 | 747 | 711 | $58,162 | ... | ... | ($1,035) |
| 2. Management and Administration | 52 | 50 | 6,646 | 52 | 50 | 7,006 | 52 | 50 | $6,892 | ... | ... | (114) |
| Total | 799 | 761 | 62,586 | 799 | 761 | 66,203 | 799 | 761 | 65,054 | ... | ... | (1,149) |
| **Offsetting Collections:** | | | | | | | | | | | | |
| 1. Administration of Cases | 343 | 319 | $38,420 | 343 | 327 | $38,942 | 398 | 355 | $42,263 | 55 | 28 | $3,321 |
| 2. Management and Administration | 2 | 2 | 1,928 | 2 | 2 | 1,928 | 2 | 2 | 1,928 | ... | ... | ... |
| Total | 345 | 321 | 40,348 | 345 | 329 | 40,870 | 400 | 357 | 44,191 | 55 | 28 | 3,321 |
| **Total Authority:** | | | | | | | | | | | | |
| 1. Administration of Cases | 1,090 | 1,030 | $94,360 | 1,090 | 1,038 | $98,139 | 1,145 | 1,066 | $100,425 | 55 | 28 | $2,286 |
| 2. Management and Administration | 54 | 52 | 8,574 | 54 | 52 | 8,934 | 54 | 52 | 8,820 | ... | ... | ... |
| Total | 1,144 | 1,082 | 102,934 | 1,144 | 1,090 | 107,073 | 1,199 | 1,118 | 109,245 | 55 | 28 | 2,172 |

United States Trustee System Fund
Salaries and expenses
Summary of Resources by Program
(Dollars in thousands)

| Estimates by Program | 1994 Appropriation Enacted | | | 1994 Actual | | | 1995 Availability | | | 1996 Base | | | 1996 Estimate | | | Increase/Decrease | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Perm Pos. | WY | Amount | Perm Pos. | WY | Amount | Perm Pos. | WY | Amount | Perm Pos. | WY | Amount | Perm Pos. | WY | Amount | Perm Pos. | WY | Amount |
| **DIRECT AUTHORITY** | | | | | | | | | | | | | | | | | | |
| 1. Administration of Cases | 758 | 727 | $54,928 | 758 | 725 | $65,525 | 747 | 711 | $55,940 | 747 | 711 | $59,197 | 747 | 711 | $58,162 | ... | ... | ($1,035) |
| 2. Management and Administration | 53 | 51 | 6,585 | 53 | 51 | 7,027 | 52 | 50 | 6,646 | 52 | 50 | 7,006 | 52 | 50 | 6,892 | ... | ... | (114) |
| Total | 811 | 778 | 61,513 | 811 | 776 | 72,552 | 799 | 761 | 62,586 | 799 | 761 | 66,203 | 799 | 761 | 65,054 | ... | ... | (1,149) |
| **OFFSETTING COLLECTIONS** | | | | | | | | | | | | | | | | | | |
| 1. Administration of Cases | 326 | 389 | $35,651 | 326 | 389 | $27,208 | 343 | 319 | $38,420 | 343 | 327 | $38,942 | 398 | 355 | $42,263 | 55 | 28 | $3,321 |
| 2. Management and Administration | 2 | 16 | 1,836 | 2 | 16 | 1,836 | 2 | 2 | 1,928 | 2 | 2 | 1,928 | 2 | 2 | 1,928 | ... | ... | ... |
| Total | 328 | 405 | 37,487 | 328 | 405 | 29,044 | 345 | 321 | 40,348 | 345 | 329 | 40,870 | 400 | 357 | 44,191 | 55 | 28 | 3,321 |
| **TOTAL AUTHORITY** | | | | | | | | | | | | | | | | | | |
| 1. Administration of Cases | 1,084 | 1,116 | $90,579 | 1,084 | 1,114 | $92,733 | 1,090 | 1,030 | $94,360 | 1,090 | 1,038 | $98,139 | 1,145 | 1,066 | $100,425 | 55 | 28 | $2,286 |
| 2. Management and Administration | 55 | 67 | 8,421 | 55 | 67 | 8,863 | 54 | 52 | 8,574 | 54 | 52 | 8,834 | 54 | 52 | 8,820 | ... | ... | ... |
| Total | 1,139 | 1,183 | 99,000 | 1,139 | 1,181 | 101,596 | 1,144 | 1,082 | 102,934 | 1,144 | 1,090 | 107,073 | 1,199 | 1,118 | 109,245 | 55 | 28 | 2,172 |
| **Other Workyears:** | | | | | | | | | | | | | | | | | | |
| Overtime: | | | | | | | | | | | | | | | | | | |
| AUO | | 0 | | | 0 | | | 0 | | | 0 | | | 0 | | | 0 | |
| Other | | 5 | | | 6 | | | 5 | | | 5 | | | 5 | | | 0 | |
| Total compensable workyears | | 1,188 | | | 1,185 | | | 1,087 | | | 1,095 | | | 1,123 | | | 28 | |

United States Trustee System Fund

Salaries and Expenses

Justification of Program and Performance

Activity Resource Summary

(Dollars in thousands)

Activity: Administration of Cases

| | 1995 Appropriation Anticipated | | | 1996 Base | | | 1996 Estimate | | | Increase/Decrease | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount |
| Direct Appropriation.... | 799 | 761 | $62,586 | 799 | 761 | $66,203 | 799 | 761 | $65,054 | ... | ... | ($1,499) |
| Offsetting Collections.. | 345 | 321 | 40,348 | 345 | 329 | 40,870 | 400 | 357 | 44,191 | 55 | 28 | 3,321 |
| Total............... | 1,144 | 1,082 | 102,934 | 1,144 | 1,090 | 107,073 | 1,199 | 1,118 | 109,245 | 55 | 28 | 2,172 |

The Administration of Cases budget activity provides resources for the primary mission of the United States Trustee Program, safeguarding and strengthening the integrity of the Nation's bankruptcy system. Funds requested for the Administration of Cases support personnel in 21 regions and 93 district offices throughout the country.

LONG-RANGE GOALS: In creating the United States Trustee Program, Congress established one agency with responsibility for the administration of bankruptcy estates. Within this broad responsibility, the primary goals of the Program are:

To assure that bankruptcy cases are administered expeditiously and that all parties comply with their legal obligations.

To assure that an appropriate number of qualified individuals are fairly and impartially recruited and appointed to serve as private trustees.

To assure that private trustees adhere to strict fiduciary standards and act to maximize distribution of assets to creditors.

To assure that private trustees are subject to close supervision through consistent national standards and policies.

To assure that private trustees comply with Program requirements through training, reporting requirements, financial audits, evaluations and investigations.

To assure that violations of applicable criminal laws are referred to law enforcement and regulatory agencies.

To assure that the cost of the administration of bankruptcy cases is adequately monitored so that it is economical and expeditious, that assets not be dissipated and distributions maximized.

**BASE PROGRAM DESCRIPTION:** The Bankruptcy Reform Act of 1978 established the United States Trustee Program on a pilot basis in 18 Federal judicial districts. With the enactment of the Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986 (P.L. 99-554), the United States Trustee Program was expanded nationwide to 88 Federal judicial districts. The six judicial districts of North Carolina and Alabama have been exempted from the Program until the year 2002.

The major thrust of these nationwide reforms was to separate the adjudicative and administrative functions in bankruptcy cases. Congress created one agency with responsibility for the administration of bankruptcy estates and to serve as a "watchdog" over the entire bankruptcy process. The Program completed its nationwide expansion in 1989 under the transitional provisions of the 1986 Act. Currently, the Program operates 93 United States Trustee offices nationwide which are responsible for the oversight of over one million pending bankruptcy cases.

The bankruptcy process, both historically and presently, is largely entrusted to private individuals. Whether a chapter 7 (liquidation) case, where assets, if any, are distributed to creditors; a chapter 11 (reorganization) case, where a debtor seeks to restructure its financial affairs; or a chapter 12 (family farmer) or chapter 13 (wage earner) case, where debtors seek to repay their debts, the individual directly responsible for the administration of a particular case is appointed by the United States Trustee, except in the case of chapter 11 where the debtor remains in possession. The United States Trustee supervises the conduct of these private trustees and debtors and generally ensures that the interests of the parties are not abridged during the pendency of the cases.

The mission of the Program is to act in the public interest to promote the efficiency and to protect and preserve the integrity of the bankruptcy system. It works to secure the just, speedy, and economical resolution of bankruptcy cases; monitors the conduct of parties and takes action to ensure compliance with applicable laws and procedures; identifies and investigates bankruptcy fraud and abuse; and oversees administrative functions in bankruptcy cases.

A primary goal of the Program is to bring expeditious reality to the opportunity for creditors to share in the available assets of the debtors. This requires that the assets neither be concealed by debtors nor dissipated by private trustees or excessive professional fees. The Program's supervisory responsibility mandates that a debtor's circumstances be scrutinized and that all assets be included in the estate. To the degree that discrepancies exist, further investigation must be undertaken.

Similarly, accountability structures have been put in place with regard to private trustees. Background investigations, reporting requirements and audits have been implemented. Cases can now be monitored to ensure not only that estate monies are not converted, but that the fiduciary standards of the law are upheld.

Despite the Program's successes in developing mechanisms to require accountability, challenges remain. The Program must increase its efforts to effectively police debtors-in-possession in the large number of chapter 11 cases that have little or no active creditor interest and to ensure that chapter 11 debtors carry out the promises they have made to creditors and the bankruptcy court. Moreover, there is a need for to ensure that the fee applications of trustees and professionals are appropriate and proper and that applicants have no conflicts in interest. The demand that trustees and professionals perform services for the bankruptcy estate that do not drain its assets is fundamental.

Two recent cases demonstrate the need for continued careful scrutiny: In Region 2 (New York), the United States Bankruptcy Court for the Southern District of New York sanctioned debtor's counsel in the Lesley Fay Company bankruptcy case for not fully disclosing conflicts in interest and other connections it had with principals of the debtor and various other parties in the case. As a result of a motion by the United States Trustee, the court ordered counsel to

-10-

pay $800,000 plus additional costs that were incurred by the creditors' committees. In Region 9 (Ohio), the 6th Circuit Court of Appeals in the Federated Department Stores case sustained the U.S. Trustee's objection to employing Lehman Bros. who had been paid $250,000 per month, some of which will now be recovered to the extent of $1 million or more.

There have also been beneficial results such as those above in smaller cases. For example in Region 17 (San Francisco), a bankruptcy judge in the case of In re Plexus Computers, Inc., reduced the trustee's requested compensation from $267,016 to $100,000 based on the objection of the United States Trustee. The private trustee who had acted as both the chapter 11 and chapter 7 trustee in the case, requested the maximum statutory compensation, yet had no contemporaneous time records to support the request.

## ACCOMPLISHMENTS AND WORKLOAD:

| Administration of Cases | 1988 Actual | 1989 Actual | 1990 Actual | 1991 Actual | 1992 Actual | 1993 Actual | 1994 Actual | 1995 Estimate | 1996 Estimate |
|---|---|---|---|---|---|---|---|---|---|
| **Chapter 7** | | | | | | | | | |
| # of Bankruptcy Filings.. | 431,231 | 464,375 | 521,360 | 638,504 | 684,866 | 621,071 | 571,971 | 554,812 | 554,812 |
| # of Pending Cases...... | 382,036 | 404,823 | 435,765 | 497,087 | 498,015 | 414,765 | 380,369 | 367,436* | 367,436* |
| **Chapter 11** | | | | | | | | | |
| # of Bankruptcy Filings.. | 18,279 | 17,623 | 20,067 | 23,508 | 23,312 | 20,111 | 15,920 | 14,184 | 14,184 |
| # of Pending Cases...... | 78,474 | 76,876 | 78,607 | 83,474 | 85,602 | 78,602 | 69,472 | 62,470 | 62,470 |
| **Chapter 12** | | | | | | | | | |
| # of Bankruptcy Filings.. | 2,528 | 1,608 | 1,320 | 1,460 | 1,625 | 1,355 | 931 | 931 | 931 |
| # of Pending Cases...... | 6,672 | 7,225 | 7,433 | 7,063 | 6,603 | 5,751 | 4,848 | 4,848 | 4,848 |
| **Chapter 13** | | | | | | | | | |
| # of Bankruptcy Filings.. | 152,695 | 173,318 | 207,211 | 255,484 | 267,631 | 254,667 | 248,942 | 251,431 | 251,431 |
| # of Pending Cases...... | 361,014 | 403,622 | 471,422 | 563,357 | 634,141 | 659,470 | 666,017 | 666,017 | 666,017 |
| **Total** | | | | | | | | | |
| # of Bankruptcy Filings.. | 604,733 | 656,924 | 749,958 | 918,956 | 977,434 | 897,204 | 837,764 | 821,358 | 821,358 |
| # of Pending Cases...... | 828,196 | 892,546 | 993,227 | 1,150,981 | 1,224,361 | 1,158,588 | 1,120,706 | 1,100,771 | 1,100,771 |

## PROGRAM CHANGES:

| | 1996 Base | | | 1996 Estimate | | | Increase/Decrease | | |
|---|---|---|---|---|---|---|---|---|---|
| | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount |
| Direct Authority............... | 747 | 711 | $59,197 | 747 | 711 | $58,162 | ... | ... | ($1,035) |
| Offsetting Collections......... | 343 | 327 | 38,942 | 398 | 355 | 42,263 | 55 | 18 | 3,321 |
| Total...................... | 1,090 | 1,038 | 98,139 | 1,145 | 1,066 | 100,425 | 55 | 18 | 2,286 |

* Reflects reestimate from President's Budget

-11-

**Program Decrease:** For Administration of Cases, the budget request includes a program decrease of $1,035,000 in direct authority associated with the requirement that the 1996 pay increase effective in January 1996, be absorbed. These reductions will be achieved through careful management of personnel resources and by reducing costs of travel, transportation, printing, other services, supplies and equipment.

These additional reductions present serious challenges. The Program has already taken significant steps to reduce spending in these non-personnel areas, reducing travel and training, limiting the number of space relocations that are undertaken, reducing communications costs, and delaying or canceling furniture and equipment purchases. These steps have been taken in an effort to maximize personnel resources.

With bankruptcy filings increasing by 66 percent since 1986 and a pending caseload of over 1 million cases, the Program has had to find ways to do more with less, particularly since staffing enhancements have not kept pace with workload requirements. The workload of the United States Trustee Program is uncontrollable as it reflects the flow and complex quality of bankruptcy cases. The bankruptcy system is such that the Program cannot decline to participate in a case. We must provide a presence in every filing, and perform certain administrative tasks to move the caseload through the system. At the same time, the Program's personnel have strived to strengthen the Agency's supervisory and "watchdog" role in the areas of trustee oversight and overall case supervision by ensuring that cases are closed in a timely manner, detecting concealed assets and rectifying debtor fraud, increasing the number and quality of audits and follow-up reconstructions, developing standards to ensure that professionals appointed in bankruptcy cases avoid conflicts of interest, objecting to unreasonable professional fee applications, and assuring that chapter 11 debtors meet their obligations under court-ordered reorganization plans.

**Program Increase:** An increase of 55 positions (20 attorneys), 28 workyears and $3,321,000 in offsetting collections is requested to allow the Program to strengthen its chapter 11 case supervision and post confirmation oversight. Also included in the request is a general provision language change allowing the Program to collect quarterly fee payments on cases after a reorganization plan has been filed with the bankruptcy court.

Enhanced oversight of the post confirmation phase of chapter 11 is critical because there is no entity in the process currently taking responsibility for these cases. Post confirmation is the stage in the bankruptcy process where debtors carry out the promises they have made to the bankruptcy court in return for the opportunity to restructure their financial affairs and receive relief from their creditors. Traditionally, there has been scant oversight of this final stage in the chapter 11 process.

Chapter 11 provides a debtor, working with its creditors, an opportunity to restructure its financial affairs. The opportunity emanates from the substantial protection the law affords a debtor in precluding creditor enforcement actions. In exchange, the debtor is obligated to meet certain responsibilities (e.g., disclosing assets and proposing and implementing a reorganization plan).

It is in the post confirmation stage of chapter 11 that debtors seek to implement the court-ordered reorganization plan. Unfortunately, the intent does not meet the reality. After filing for protection, debtors in small cases rarely take steps to effectuate a true reorganization and move their cases to resolution.

The bankruptcy system has many chapter 11 reorganization cases that proceed to the point of a restructuring plan being approved by the court, but the case continues to linger in the system for years with cases sitting on the docket and the debtor pursuing its own self-interest, while professional fees continue to mount and estate assets are dissipated. The

-12-

ultimate effect of such action is an increasing public dissatisfaction with the high cost of bankruptcy. Failure of a debtor to carry out its post confirmation responsibilities diminishes the return of assets to creditors and contributes to public dissatisfaction with the system. In addition, failure of debtors to successfully reorganize or liquidate has drawn heavy criticism from companies which must compete with those businesses receiving continuing protection under the Bankruptcy Code.

It is essential that the Program provide the oversight necessary to bring cases to a faster resolution and to ensure that a debtor receiving a court-confirmed reorganization plan fulfills the promises it has made to the court and its creditors to successfully implement that plan. The Program's ability to perform these responsibilities is aggravated by the complex, time-consuming nature of these tasks and resource limitations.

The most recent available data from the Administrative Office of the United States Courts indicates that as of September 30, 1994, there were 69,472 chapter 11 cases pending in the courts (including both preconfirmation and post confirmation cases). Yet, the Program's chapter 11 data indicate that as of October 15, 1994 there were only 18,382 chapter 11 cases for which no confirmation plan had been approved. These statistics highlight the problem of chapter 11 cases languishing on the docket after a plan of confirmation has been approved by the court. For cases to remain on the docket in an active status when debtors are not meeting their obligations as specified in the restructuring plan is a patent abuse of the bankruptcy system. It is estimated that approximately 80 percent of the reorganization plans confirmed under chapter 11 of the Bankruptcy Code do not make it to fruition.

Monitoring debtors in post confirmation is a duty which was not envisioned by the staffing structure at the time of the Program's nationwide expansion and one for which the Program has never received resources. The requested increase is critical to ensure that there is an entity in the bankruptcy process which will require debtors to meet their post confirmation responsibilities under the law.

General Provision: The enhancement for the post confirmation initiative is paid for by a proposed change in the law which, if enacted, would require chapter 11 debtors to continue to make quarterly payments based on disbursements until a case is converted or dismissed. The proposed change is a logical extension of the Program's present funding mechanism. Currently, chapter 11 debtors are only assessed quarterly fees until a reorganization plan is confirmed by the bankruptcy court, making post confirmation debtors the only entities in the bankruptcy process who are exempt from fees. There is no rational basis for such an exemption and the proposed amendment will close a loophole that allows cases to languish without paying for Program services.

It is estimated that the change in the statute would raise an additional $18.2 million. The increased fees would be deposited in the United States Trustee System Fund as offsetting collections and would be sufficient to fund the Program enhancement as well as meet a significant shortfall in chapter 11 offsetting collections resulting from a decline in chapter 11 filings over the past 18 months.

The Program has a responsibility to ensure that the debtors who seek protection of the Bankruptcy Code comply with the law. A recent Memorandum of Understanding with the bankruptcy courts places post confirmation activities as a responsibility of the Program. Yet, insufficient staffing levels have all but precluded the performance of chapter 11 post confirmation oversight activities. The requested program change, in conjunction with the proposed general provision language change, would ensure that the Program has adequate resources to begin to address post confirmation problems.

-13-

<u>Activity:</u> Management and Administration

| | 1995 Appropriation Anticipated | | | 1996 Base | | | 1996 Estimate | | | Increase/Decrease | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount |
| Direct Appropriation...... | 52 | 50 | $6,646 | 52 | 50 | $7,006 | 52 | 50 | $6,892 | ... | ... | ($114) |
| Offsetting Collections.... | 2 | 2 | 1,928 | 2 | 2 | 1,928 | 2 | 2 | 1,928 | ... | ... | ... |
| Total................ | 54 | 52 | 8,574 | 54 | 52 | 8,934 | 54 | 52 | 8,820 | ... | ... | ( 114) |

The Management and Administration budget activity provides resources necessary to furnish the United States Trustee Program with effective program management, policy direction, legal advice, administrative support and coordination.

<u>LONG-RANGE GOALS:</u>

To develop policies and program priorities consistent with the "Bankruptcy Judges, United States Trustees and Family Farmers Bankruptcy Act of 1986," (P.L. 99-554).

To provide legal counsel to the Director and the United States Trustees.

To provide oversight of private trustee management activities, as well as to gauge the quality of the operations of the Program's field offices.

To plan and implement government reinvention initiatives including: a U.S. Trustee field office and Executive office exchange program to augment the sharing of information and knowledge while providing field office personnel with direct input to operations, decentralization of some procurement authority to the Program's field offices, and development of an incentive program to reward field office chapter 11 quarterly fee collection successes.

To enhance the management of the Program's staff by training supervisors and requiring adherence to high professional standards.

To develop and maintain a comprehensive automated information system that satisfies Program needs, as well as Departmental and Government-wide design and security standards.

To provide the full range of administrative support services to field offices.

To provide liaison with Department of Justice components, other central administrative bodies, such as the Office of Management and Budget, the Office of Personnel Management, the General Services Administration, the Administrative Office of the United States Courts, and the Congress.

To manage the United States Trustee System Fund.

-14-

558

**BASE PROGRAM DESCRIPTION:** Management and Administration has a clearly defined leadership role in 1) developing and directing the Program's long and short term goals, adopting uniform policies and assessing the efforts of the Program's field offices; 2) supervising the Program's litigation activities; 3) conducting the inquiries into misappropriation of funds by private trustees; 4) developing audit policies and private trustee reporting requirements; 5) coordinating and supervising the resolution of the audits; and 6) providing administrative services such as personnel, procurement and contracts, automation, budget and finance, training, and facilities management.
The Executive Office for United States Trustees (EOUST) located in Washington, D.C. provides this centralized support.
The EOUST is composed of the Office of the Director, the Office of the General Counsel, the Office of Review and Oversight, and the Office of Administration.

**Office of the Director:** The Office of the Director provides comprehensive policy and management direction to the United States Trustees and their staff, as well as establishing policies and guidelines for the operations of the EOUST.

**General Counsel:** The demands imposed upon the General Counsel's office have expanded as the caseload has grown and as the Program has developed and implemented a more aggressive enforcement program. The commencement of enforcement action requires rigorous preparation and consistently high standards of advocacy. Because the United States Trustee Program has no statutory authority to remove a trustee who violates the public trust, the Program's enforcement efforts are successful only if upheld in court. The Office of General Counsel is involved in every major case and provides advocacy training for the Program's employees. It also serves as the source of ethics information and direction for Program personnel.

**Office of Review and Oversight:** The Office of Review and Oversight (ORO) is the EOUST Division which is involved with the oversight and supervision of private trustees. The Division's responsibilities include responding to questions from the field regarding issues of trustee supervision, analysis of trustee security forms and background checks, review of audit findings, and reconstruction of trustee financial records. It is involved in every investigation of trustee defalcation. ORO also reviews and approves the budgets of the chapter 13 standing trustees. The Division's workload has grown dramatically as the Program has designed new mechanisms to ensure that debtors and private trustees comply with their legal obligations and duties.

**Office of Administration:** The Office of Administration consists of four divisions -- Facilities and Human Resources, Administrative Services, Information Systems, and Budget and Finance. The Office's responsibilities include managing the Program's independent personnel authority, managing a nationwide office space program, coordinating procurement actions and managing Program-wide contracts, providing daily technical advice and support regarding the automated case management system and other computer-related activities, managing the financial operation of the United States Trustee System Fund, and coordinating and developing the Program's budget and resource plan.

**ACCOMPLISHMENTS AND WORKLOAD:**

**Annual Performance Goals:** The Program has devoted considerable effort in the last two years in developing and implementing methods for evaluating performance of both private trustees and Program staff. Databases have been designed to measure trustee performance in several critical areas. A chapter 7 database measures the performance of individual trustees in the case closing area, by allowing the Program to monitor the progress made by individual trustees in closing old cases, (defined as cases more than 3 years old). Another database permits the Program to measure the effectiveness of trustee operations in terms of the distribution of estate assets, i.e. the percentage of assets which are being paid out to unsecured creditors. A chapter 13 database details the expenses of standing trustees

-15-

and enables Program staff to monitor and analyze the cost per case. These databases, when combined with the yearly evaluations of trustees by Program staff, annual limited scope audits, and periodic office visits have added greatly to the Program's ability to assess trustee performance and maximize the distribution of estate assets to creditors.

A comprehensive internal evaluation program has also been established to review the performance of individual Program offices and regions. This peer review evaluation process consists of teams of field managers reviewing all aspects of performance by the staff of another region. Adhering to a detailed manual, the team spends several weeks in the region being evaluated, interviewing Program personnel, private trustees, judges and members of the bar. About a third of the regions have been reviewed and the written reports produced by the teams contain an average of 65 recommendations. In addition to preparing a written response, the United States Trustee must meet with the Program's Deputy Director to discuss his/her plan of action for correcting the deficiencies identified in the evaluation report. This internal evaluation process has been cited by the Department as a significant step in improving Program management and enhancing the monitoring of private trustees.

Factors Affecting Program Performance: Several external factors affect the Program's ability to achieve its performance goals, including resource limitations, an uncontrollable workload, and actions of the bankruptcy court. For example, the Program does not have the authority to enforce its standards through sanctions such as removing a private trustee who has failed to adhere to fiduciary standards. Rather, the Program must petition the court to take such action. The Program's accomplishments are presented in the following table:

| Item | 1993 | 1994 | Estimates 1995 | Estimates 1996 |
|---|---|---|---|---|
| **Case Closing:** | | | | |
| % of Pre-1989 Cases closed | 83.5% | 93.5% | 99.0% | 99.0% |
| % of Pre-1990 Cases closed | 52.1% | 77.1% | 88.5% | 94.3% |
| % of Pre-1991 Cases closed | N/A | 44.1% | 72.1% | 86.1% |
| **Distribution to Unsecured Creditors:** | | | | |
| Increase in percentage of estate funds distributed to unsecured creditors, using August 1992 bench mark | +21.1% | +23.0% | +24.0% | +25.0% |
| **Internal Control Measures:** | | | | |
| Internal Evaluation Team Review of Field Offices | 6 | 6 | 6 | 6 |

**PROGRAM CHANGES:**

| | 1996 Base | | | 1995 Estimate | | | Increase/Decrease | | |
|---|---|---|---|---|---|---|---|---|---|
| | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount |
| **Management and Administration** | | | | | | | | | |
| Direct Authority.......... | 52 | 50 | $7,006 | 52 | 50 | $6,892 | ... | ... | ($114) |
| Offsetting Collections..... | 2 | 2 | 1,928 | 2 | 2 | 1,928 | ... | ... | ... |
| Total............... | 54 | 52 | 8,934 | 54 | 52 | 8,820 | ... | ... | (114) |

A program decrease of $114,000 in direct authority is required to absorb the 1996 pay increase scheduled to take effect January 1, 1996. The reduction will be achieved through careful management of personnel resources and by reducing spending in non-personnel areas such as travel and transportation, printing, consulting services, supplies, furniture and equipment.

## U.S. Trustee System Fund
### Salaries and Expenses
### Justification of Multi-Activity Program Changes
#### (Dollars in thousands)

| | 1996 Pay Raise Absorption | | | Total | | |
|---|---|---|---|---|---|---|
| | Perm. Pos. | WY | Amount | Perm. Pos. | WY | Amount |
| **Direct Authority** | | | | | | |
| 1. Administration of Cases............. | ... | ... | ($1,035) | ... | ... | ($1,035) |
| 2. Management and Administration...... | ... | ... | (114) | ... | ... | ($114) |
| Subtotal........................ | ... | ... | (1,449) | ... | ... | ($1,449) |
| **Offsetting Collections** | | | | | | |
| 1. Administration of Cases............. | ... | ... | ... | ... | ... | ... |
| 2. Management and Administration...... | ... | ... | ... | ... | ... | ... |
| Subtotal........................ | ... | ... | ... | ... | ... | ... |
| **Total** | | | | | | |
| 1. Administration of Cases............. | ... | ... | ($1,035) | ... | ... | ($1,035) |
| 2. Management and Administration...... | ... | ... | (114) | ... | ... | (114) |
| Subtotal........................ | ... | ... | (1,149) | ... | ... | (1,149) |

In 1996, the United States Trustee Program will absorb the full 1996 pay raise of $1,149,000. Savings will be achieved through careful management of personnel resources and by reducing non-personnel expenditures such as travel, transportation, printing, other services, supplies and equipment.

-18-

United States Trustee System Fund
Salaries and expenses
Financial Analysis – Program Changes
(Dollars in thousands)

| Item | DIRECT AUTHORITY — Permanent Decrease — 1996 Pay Raise — Administration of cases Pos. | Amount | Management and Administration Pos. | Amount | Total Pos. | Amount | OFFSETTING COLLECTIONS — Permanent Increase — Chapter 11 — Case Supervision/Post Confirmation — Administration of cases Pos. | Amount | Management and Administration Pos. | Amount | Total Pos. | Amount | TOTAL AUTHORITY — Total Program Change — Administration of cases Pos. | Amount | Management and Administration Pos. | Amount | Total Pos. | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grades | | | | | | | | | | | | | | | | | | |
| GS/GM–15 | | | | | | | 37 | $1,960 | | | 37 | $1,960 | 37 | $1,960 | | | 37 | $1,960 |
| GS/GM–13 | | | | | | | 18 | 688 | | | 18 | 688 | 18 | 688 | | | 18 | 688 |
| GS–11 | | | | | | | | | | | | | | | | | | |
| GS–07 | | | | | | | | | | | | | | | | | | |
| GS–05 | | | | | | | | | | | | | | | | | | |
| AD Pay | | | | | | | | | | | | | | | | | | |
| Total positions and annual rate | | | | | | | 55 | 2,848 | | | 55 | 2,848 | 55 | 2,848 | | | 55 | 2,848 |
| Additional loss of workyears (–) | | | | | | | | | | | | | | | | | | |
| Lapse (–) | | | | | | | (27) | (1,324) | | | (27) | (1,324) | (27) | (1,324) | | | (27) | (1,324) |
| Other than full–time permanent | | | | | | | | | | | | | | | | | | |
| Other compensation | | | | | | | | 9 | | | | 9 | | 9 | | | | 9 |
| Total workyears and personnel Compensation | | | | | | | 28 | 1,333 | | | 28 | 1,333 | 28 | 1,333 | | | 28 | 1,333 |
| Personnel benefits | | | | | | | | 411 | | | | 411 | | 411 | | | | 411 |
| Benefits to former personnel | | ($45) | | ($5) | | ($50) | | | | | | | | (45) | | ($5) | | (50) |
| Travel and transportation of persons | | (207) | | (23) | | (230) | | 221 | | | | 221 | | 14 | | (23) | | (9) |
| GSA rent | | | | | | | | 492 | | | | 492 | | 492 | | | | 492 |
| Comm., utilities, and misc charges | | | | | | | | 66 | | | | 66 | | 66 | | | | 66 |
| Printing | | (44) | | (5) | | (49) | | 38 | | | | 38 | | (6) | | (5) | | (11) |
| Other services | | (188) | | (20) | | (208) | | 162 | | | | 162 | | (26) | | (20) | | (46) |
| Supplies and materials | | (48) | | (6) | | (54) | | 40 | | | | 40 | | (8) | | (6) | | (14) |
| Equipment | | (503) | | (55) | | (558) | | 558 | | | | 558 | | 55 | | (55) | | |
| Total program workyears & obligations changes requested, 1996 | | (1,035) | | (114) | | (1,149) | 28 | 3,321 | | | 28 | 3,321 | 28 | 2,286 | | (114) | 28 | 2,172 |

United States Trustee System Fund
Salaries and Expenses
Priority Ranking
Fiscal Year 1996

### Base Program

| Program | Ranking |
|---|---|
| Administration of Cases. . . . . . . . 1 | |
| Management and Administration. . . . . 2 | |

### Program Increase Enhancement

| Program | Ranking |
|---|---|
| Administration of Cases | Chapter 11 Case Supervision/ Post Confirmation. . . . . . . . 1 |

-20-

564

United States Trustee System Fund
Salares and expenses
Detail of Permanent Positions by Category
Fiscal Years 1994—1996

| Category | 1994 Authorized | 1995 Authorized | 1996 Program Increases | 1996 Total Authorized |
|---|---|---|---|---|
| **Direct Authority:** | | | | |
| U.S. Trustees/ Asst. U.S. Trustees (301) | 102 | 102 | 0 | 102 |
| Bankrupty Analysts (301) | 114 | 112 | 0 | 112 |
| Attorneys (905) | 144 | 142 | 0 | 142 |
| Paralegal Specialist (950) | 138 | 136 | 0 | 136 |
| Other Legal and Kindred (900–998) | 206 | 204 | 0 | 204 |
| Personnel Management (200–299) | 6 | 6 | 0 | 6 |
| Management System Specialists (301) | 37 | 36 | 0 | 36 |
| General Administrative and Clerical (300–399) | 56 | 53 | 0 | 53 |
| Security Specialists (080) | 0 | 0 | 0 | 0 |
| Accounting and Budget (500–599) | 8 | 8 | 0 | 8 |
| Subtotal | 811 | 799 | 0 | 799 |
| **Offsetting Collections:** | | | | |
| U.S. Trustees/ Asst. U.S. Trustees (301) | 0 | 0 | 0 | 0 |
| Bankrupty Analysts (301) | 80 | 85 | 17 | 102 |
| Attorneys (905) | 65 | 70 | 20 | 90 |
| Paralegal Specialist (950) | 98 | 105 | 18 | 123 |
| Other Legal and Kindred (900–998) | 82 | 82 | 0 | 82 |
| Personnel Management (200–299) | 1 | 1 | 0 | 1 |
| Management System Specialists (301) | 1 | 1 | 0 | 1 |
| General Administrative and Clerical (300–399) | 0 | 0 | 0 | 0 |
| Security Specialists (080) | 1 | 1 | 0 | 1 |
| Accounting and Budget (500–599) | 0 | 0 | 0 | 0 |
| Subtotal | 328 | 345 | 55 | 400 |
| **Total Authority:** | | | | |
| U.S. Trustees/ Asst. U.S. Trustees (301) | 102 | 102 | 0 | 102 |
| Bankrupty Analysts (301) | 194 | 197 | 17 | 214 |
| Attorneys (905) | 209 | 212 | 20 | 232 |
| Paralegal Specialist (950) | 236 | 241 | 18 | 259 |
| Other Legal and Kindred (900–998) | 288 | 286 | 0 | 286 |
| Personnel Management (200–299) | 7 | 7 | 0 | 7 |
| Management System Specialists (301) | 38 | 37 | 0 | 37 |
| General Administrative and Clerical (300–399) | 56 | 53 | 0 | 53 |
| Security Specialists (080) | 1 | 1 | 0 | 1 |
| Accounting and Budget (500–599) | 8 | 8 | 0 | 8 |
| Total | 1,139 | 1,144 | 55 | 1,199 |
| Washington | 55 | 54 | 0 | 54 |
| U.S. Field | 1,084 | 1,090 | 55 | 1,145 |
| Total | 1,139 | 1,144 | 55 | 1,199 |

United States Trustee System Fund
Salaries and expenses
Summary of Change
(Dollars in Thousands)

| | Direct Appropriation | | | Offsetting Collections | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Perm. Pos. | Work-years | Amount | Perm. Pos. | Work-years | Amount | Perm. Pos. | Work-years | Amount |
| 1995 as Enacted......... | 799 | 761 | $62,593 | 345 | 321 | $40,597 | 1,144 | 1,082 | $103,190 |
| Procurement and rent adjustments...... | ... | ... | (7) | ... | ... | (249) | ... | ... | (256) |
| 1995 Availability......... | 799 | 761 | 62,586 | 345 | 321 | 40,348 | 1,144 | 1,082 | 102,934 |
| Mandatory Increases: | | | | | | | | | |
| One Additional Compensable Day......... | ... | ... | 284 | ... | ... | ... | ... | ... | 284 |
| 1996 Pay Raise......... | ... | ... | 1,149 | ... | ... | ... | ... | ... | 1,149 |
| Annualization and Increase of 1995 Pay Raise......... | ... | ... | 1,340 | ... | ... | ... | ... | ... | 1,340 |
| Within–grade Increases......... | ... | ... | 589 | ... | ... | ... | ... | ... | 589 |
| Annualization of 17 Additional Positions Approved in 1995......... | ... | ... | ... | ... | 8 | 522 | ... | 8 | 522 |
| Health Benefits......... | ... | ... | 154 | ... | ... | ... | ... | ... | 154 |
| $80 Supplemental Retirement Contributions......... | ... | ... | 93 | ... | ... | ... | ... | ... | 93 |
| Accident Compensation......... | ... | ... | 56 | ... | ... | ... | ... | ... | 56 |
| Unemployment Compensation......... | ... | ... | 25 | ... | ... | ... | ... | ... | 25 |
| Postal Rate Increases......... | ... | ... | 105 | ... | ... | ... | ... | ... | 105 |
| General Pricing Level Adjustments......... | ... | ... | 334 | ... | ... | ... | ... | ... | 334 |
| Adjustment for 1995 Double Rent Reduction......... | ... | ... | 218 | ... | ... | ... | ... | ... | 218 |
| Total, Mandatory Increases......... | ... | ... | 4,347 | ... | 8 | 522 | ... | 8 | 4,869 |
| Decreases (automatic,nonpolicy): | | | | | | | | | |
| FTS 2000 Savings......... | ... | ... | (129) | ... | ... | ... | ... | ... | (129) |
| FERS Savings......... | ... | ... | (601) | ... | ... | ... | ... | ... | (601) |
| Total, Decreases (automatic, nonpolicy)......... | ... | ... | (730) | ... | ... | ... | ... | ... | (730) |
| 1996 Base......... | 799 | 761 | 66,203 | 345 | 329 | 40,870 | 1,144 | 1,090 | 107,073 |
| Program Increases......... | ... | ... | ... | 55 | 28 | 3,321 | 55 | 28 | 3,321 |
| Program Decreases......... | ... | ... | (1,149) | ... | ... | ... | ... | ... | (1,149) |
| 1996 Estimate......... | 799 | 761 | 65,054 | 400 | 357 | 44,191 | 1,199 | 1,118 | 109,245 |

United States Trustee System Fund
Justification of Adjustments to Base
Dollars in thousands

Adjustments to Base:

Mandatory Increases:

| | WYS | Amount |
|---|---|---|
| 1. One additional compensable day................................................. The annual salary rate for Federal employees is based on 260 paid days. FY 1996 has 261 days. This request includes appropriate personnel benefits as well as pay for the additional day ($217,000 for pay and $67,000 for benefits). | | $284 |
| 1996 pay raise............................................................................. ...is request provides for the proposed 2.2 percent pay raise to be effective in January of 1996 and is consistent with Administration policy. The amount requested, $1,149,000, represents the pay amounts for three-quarters of the fiscal year plus appropriate benefits ($877,000 pay and $272,000 benefits = $1,149,000). | | 1,149 |
| 3. Annualization and increase of 1995 pay raise........................... This pay annualization represents first quarter amounts (October through December) of the anticipated 1995 pay increase of 3.3 percent effective in January 1994 plus appropriate personnel benefits and the additional amount required above the 1.6 percent originally requested for the three-quarters of the year ($1,023,000 for pay and $317,000 for benefits). | | 1,340 |
| 4. Within-grade increases........................................................... This request provides for the expected increase in costs of within-grade increases. This increase is based on an accurate, dynamic model of the Department's employee population which includes numerous factors such as anticipated pay raises, adjustments to include three-year attrition/separation rates, and career ladder series to reflect promotion policy for each organization. The request includes $449,000 for pay and $140,000 for benefits. | | 589 |
| 5. Annualization of 17 additional positions approved in 1995............ is provides for the annualization of 17 additional positions approved in the 1995 Appropriations Act for the United States Trustee System Fund. | 8 | 522 |

($ in thousands)

| | Approved 1995 Increases | Annualization Required |
|---|---|---|
| Annual salary rate of 35 approved positions...... | $ 710 | $ 750 |
| Less lapse (50%)................................... | -355 | -355 |
| Net compensation.................................. | 355 | 395 |
| Associated employee benefits..................... | 109 | 121 |
| Other (non-personnel): | | |
| Travel and relocation............................ | 57 | 57 |
| Transportation................................... | 9 | 9 |
| GSA Rent......................................... | 106 | -1 |
| Communications/Utilities......................... | 20 | 20 |
| Printing/Reproduction............................ | 11 | 11 |
| Other services................................... | 50 | 50 |
| Supplies......................................... | 13 | 13 |
| Equipment........................................ | 170 | -153 |
| Total Costs subject to Annualization............ | 900 | 522 |

-2.3-

| | WYS | Amount |
|---|---|---|

**6. Health benefits.........................................** — Amount: 154

The Federal Employees Health Benefits Act (P.L. 93-246) provided that the Government's share of health insurance would be 60 percent of the total rate commencing in 1975. This rate was subsequently increased to 72 percent. The requested increase of $154,000 provides funds for actual increased costs from pay period 2 to pay period 3 of 1994 projected for a full year.

**7. $80 supplemental retirement contributions..............** — Amount: 93

For FY 1995 to 1998, agencies are required to remit into the Civil Service Retirement and Disability Fund as an offset for early retirements an amount equal to $80 times the number of employees who, as of March 31 of that year, are covered by either the CSRS or FERS retirement systems. The requested increase of $93,000 provides for this contribution.

**8. Accident compensation...................................** — Amount: 56

s increase reflects the billing provided by the Department of Labor for the actual costs in 1994 of employees' accident compensation. The 1996 amount will be $56,000.

**9. Unemployment compensation...............................** — Amount: 25

This increase is based upon the most recent complete annual billing provided by the Department of Labor (DOL) for employees' unemployment compensation. An increase of $25,000 is required to meet our commitment to DOL.

**10. Postal rate increases..................................** — Amount: 105

The United States Postal Service plans a rate increase of 10.3 percent for first class mail in January of 1995. The cost will rise from 20 to 32 cents per stamp. An increase of $105,000 is requested in 1996 to cover this rate adjustment.

**11. General pricing level adjustments......................** — WYS: ., Amount: 334

This request applies OMB pricing guidance as of June 6, 1994, to selected expense categories. The increased costs identified result from applying a factor of 3.0 percent against those subobject classes where the prices that the Government pays are established through the market system instead of by law or regulation. Generally, the factor is applied to supplies, materials, equipment, contracts with the private sector, printing costs, transportation costs and utilities.

**. Adjustment for 1995 Double Rent Reduction................** — Amount: 218

The 1995 Appropriations Act had the effect of applying the rent reduction for the United States Trustee Program twice. This request restores the second reduction.

**Total mandatory increases................................** — WYS: 8, Amount: 4,869

**Decreases:**

**1. FERS Savings..........................................** — Amount: (601)

Effective October 2, 1994, there was an overall reduction in the amount of required agency contribution for FERS. The non-law enforcement agency rate fell from 12.9 percent to 11.4 percent. The 1996 decrease is $601,000.

-24-

| | WYS | Amount |
|---|---|---|
| 2. FTS 2000 savings............................................................... This decrease reflects FTS 2000 data compiled by the General Services Administration for the Office of Management and Budget. The price redetermination takes into consideration both voice and data services and is an across-the-board Government-wide savings, consistent with the President's commitment regarding administrative cost reductions. The 1996 decrease is $129,000. | | (129) |
| Total decreases............................................................. | | (730) |
| Total Adjustments to Base................................................... | 8 | 4,139 |

United States Trustee System Fund
Salaries and expenses
Summary of Requirements by Grade and Object Class
(Dollars in thousands)

| Grades and salary ranges | 1994 Actual Positions & Workyears | 1994 Actual Amount | 1995 Estimate Positions & Workyears | 1995 Estimate Amount | 1996 Request Positions & Workyears | 1996 Request Amount | Increase/Decrease Positions & Workyears | Increase/Decrease Amount |
|---|---|---|---|---|---|---|---|---|
| ES-6, $122,040 | 1 | | 1 | | 1 | | ... | ... |
| ES-5, $117,927 | 1 | | 1 | | 1 | | ... | ... |
| ES-4, $113,180 | 1 | | 1 | | 1 | | ... | ... |
| ES-3, $109,012 | 21 | | 21 | | 21 | | ... | ... |
| ES-2, $102,738 | 1 | | 1 | | 1 | | ... | ... |
| GS-15, $70,482–91,629 | 100 | | 100 | | 100 | | ... | ... |
| GS-14, $59,920–77,893 | 181 | | 181 | | 181 | | ... | ... |
| GS-13, $50,706–65,915 | 130 | | 136 | | 173 | | 37 | ... |
| GS-12, $42,641–55,432 | 53 | | 52 | | 52 | | ... | ... |
| GS-11, $35,578–46,249 | 116 | | 116 | | 116 | | ... | ... |
| GS-10, $32,382–42,102 | 2 | | 2 | | 2 | | ... | ... |
| GS-9, $29,405–38,228 | 111 | | 111 | | 129 | | 18 | ... |
| GS-8, $26,622–34,605 | 18 | | 18 | | 18 | | ... | ... |
| GS-7, $24,038–31,245 | 199 | | 202 | | 202 | | ... | ... |
| GS-6, $21,632–28,121 | 47 | | 47 | | 47 | | ... | ... |
| GS-5, $19,407–25,233 | 44 | | 41 | | 41 | | ... | ... |
| GS-4, $17,346–22,547 | 4 | | 4 | | 4 | | ... | ... |
| GS-3, $15,452–20,092 | 4 | | 4 | | 4 | | ... | ... |
| GS-2, $14,161–17,818 | 1 | | 1 | | 1 | | ... | ... |
| Ungraded positions | 107 | | 107 | | 107 | | ... | ... |
| 1996 pay increase | | | | | | $1,169 | ... | $1,169 |
| Total, appropriated positions | 1,139 | $53,560 | 1,144 | $55,783 | 1,199 | 60,982 | 55 | 5,199 |
| Pay above stated annual rates | ... | 205 | ... | 215 | ... | 217 | ... | 2 |
| Lapses | ... | (485) | (76) | (2,255) | (95) | (3,563) | (19) | (1,308) |
| Savings due to lower pay scales for part of year | ... | ... | ... | (680) | ... | (292) | ... | 388 |
| Net full-time permanent | 1,139 | 53,280 | 1,068 | 53,063 | 1,104 | 57,344 | 36 | 4,281 |
| Other than permanent: | | | | | | | | |
| Temporary employment | 35 | 1,383 | 10 | 115 | 10 | 115 | ... | ... |
| Other part-time and intermittent employment | 7 | 107 | 4 | 30 | 4 | 30 | ... | ... |
| Other personnel compensation: | | | | | | | | |
| Overtime | 5 | 181 | 5 | 193 | 5 | 193 | ... | ... |
| Administratively uncontrollable overtime | ... | ... | ... | ... | ... | ... | ... | ... |
| Other compensation | ... | 387 | ... | 332 | ... | 345 | ... | 13 |
| Special personnel services payments | | | | | | | | |
| Total, workyears and personnel compensation | 1,186 | 55,338 | 1,087 | 53,733 | 1,123 | 58,027 | 36 | 4,294 |
| Less, Offsetting Collections | (405) | (25,020) | (321) | (21,020) | (357) | (22,748) | (35) | (1,728) |
| Total, Direct workyears and personnel compensation | 781 | 30,318 | 766 | 32,713 | 766 | 35,279 | 0 | 2,566 |
| Average ES Salary | | ($109,670) | | ($109,670) | | ($109,670) | | |
| Average GS Salary | | ($40,105) | | ($40,213) | | ($40,632) | | |
| Average GS Grade | | 11.5 | | 11.5 | | 11.5 | | |

-26-

**United States Trustee System Fund**
**Salaries and expenses**
**Summary of Requirements by Grade and Object Class**
**(Dollars in thousands)**

| Object Class | 1994 Actual | | 1995 Estimate | | 1996 Request | | Increase/Decrease | |
|---|---|---|---|---|---|---|---|---|
| | Workyears | Amount | Workyears | Amount | Workyears | Amount | Workyears | Amount |
| 11.1 Full–time permanent | 1,139 | $54,750 | 1,068 | $53,063 | 1,104 | $57,344 | 35 | $4,281 |
| 11.3 Other than full–time permanent | 42 | 215 | 14 | 145 | 14 | 145 | ... | ... |
| 11.5 Other personnel compensation | 5 | 373 | 5 | 525 | 5 | 538 | ... | 13 |
| 11.8 Special personal services payments | ... | ... | ... | ... | ... | ... | ... | ... |
| Total | 1,186 | 55,338 | 1,067 | 53,733 | 1,123 | 58,027 | 35 | 4,294 |
| 12 Personnel benefits | | 14,277 | | 14,774 | | 15,829 | | 1,055 |
| 13 Benefits to former personnel | | 502 | | 750 | | 700 | | (50) |
| 21 Travel and transportation of persons | | 2,265 | | 2,930 | | 2,892 | | (38) |
| 22 Transportation of things | | 235 | | 257 | | 267 | | 10 |
| 23.1 GSA rent | | 14,352 | ... | 14,436 | | 15,153 | | 717 |
| 23.2 Rental payments to others | | 183 | | 275 | | 377 | | 102 |
| 23.3 Communications, utilities and miscellaneous charges | | 3,314 | | 3,480 | | 3,547 | | 67 |
| 24 Printing and reproduction | | 208 | | 210 | | 257 | | 47 |
| 25.1 Consulting Services | | 1,336 | | 1,210 | | 1,255 | | 45 |
| 25.2 Other Services | | 1,577 | | 2,458 | | 2,377 | | (81) |
| 25.3 Other Government Services | | 5,660 | | 5,300 | | 5,124 | | (176) |
| 26 Supplies and materials | | 1,286 | | 1,645 | | 1,396 | | (249) |
| 31 Equipment | | 1,063 | | 2,142 | | 2,044 | | (98) |
| Total obligations | 1,186 | 101,596 | 1,067 | 103,600 | 1,123 | 109,245 | 35 | 5,645 |
| Unobligated balance start–of–year | | (2,484) | | (666) | | ... | | 666 |
| Recovery of Prior Year Obligations | | (629) | | ... | | ... | | ... |
| Unobligated balance end–of–year | | 666 | | | | | | |
| Total requirements | 1,186 | 99,149 | 1,087 | 102,934 | 1,123 | 109,245 | 36 | 6,311 |
| Less, Available Offsetting Collections | (405) | (29,044) | (321) | (40,348) | (357) | (44,191) | (36) | (3,843) |
| Total Direct requirements | 781 | 70,105 | 765 | 62,586 | 766 | 65,054 | | 2,468 |

Relation of obligations to outlays:

| | | | | |
|---|---|---|---|---|
| Total obligations | | 101,596 | 103,600 | 109,245 |
| Less Offsetting Collections | | (29,044) | (40,348) | (44,191) |
| Total direct requirements | | 72,552 | 63,252 | 65,054 |
| Obligated balance, start–of–year | | 10,319 | 14,577 | 15,873 |
| Obligated balance, end–of–year | | (14,577) | (15,873) | (18,342) |
| Adjustments in unexpired accounts | | (629) | | |
| Outlays | | 67,665 | 61,956 | 62,585 |